PARIENTE, J.
When will a drug-detection dog’s alert to the exterior of a vehicle provide an officer with probable cause to conduct a warrant-less search of the interior of the vehicle? That is the question in this case, and the answer is integral to the constitutional right of all individuals in this state to be protected from unreasonable searches and seizures.[1]
The issue of when a dog’s alert provides probable cause for a search hinges on the dog’s reliability as a detector of illegal substances within the vehicle. We hold that the State may establish probable cause by demonstrating that the officer had a reasonable basis for believing the dog to be reliable based on the totality of the circumstances. Because a dog cannot be cross-examined like a police officer on the scene whose observations often provide the basis for probable cause to search a vehicle, the State must introduce evidence concerning the dog’s reliability. In this case, we specifically address the question of what evidence the State must introduce in order to establish the reasonableness of the officer’s belief — in other words, what evidence must be introduced in order for the trial court to adequately undertake an objective evaluation of the officer’s belief *759 in the dog’s reliability as a predicate for determining probable cause.
The appellate courts addressing the issue in this state have differed on what evidence the State must present to meet its burden. The decision of the First District Court of Appeal in Harris v. State, 989 So.2d 1214 (Fla. 1st DCA 2008), expressly and directly conflicts with the decisions of the Second District Court of Appeal in Gibson v. State, 968 So.2d 631 (Fla. 2d DCA 2007), and Matheson v. State, 870 So.2d 8 (Fla. 2d DCA 2003).[2] In Harris, the First District without elaboration cited State v. Laveroni, 910 So.2d 333 (Fla. 4th DCA 2005), and State v. Coleman, 911 So.2d 259 (Fla. 5th DCA 2005), as authority in support of affirming the trial court, which upheld the search at issue. The First District also cited Gibson, which followed Matheson, as contradictory authority.
The reliability of a dog as a detector of illegal substances is subject to a totality of the circumstances analysis. Thus, the trial court must be presented with the evidence necessary to make an adequate determination as to the dog’s reliability. For the reasons explained below, we hold that evidence that the dog has been trained and certified to detect narcotics, standing alone, is not sufficient to establish the dog’s reliability for purposes of determining probable cause — especially since training and certification in this state are not standardized and thus each training and certification program may differ with no meaningful way to assess them.
Accordingly, we conclude that to meet its burden of establishing that the officer had a reasonable basis for believing the dog to be reliable in order to establish probable cause, the State must present the training and certification records, an explanation of the meaning of the particular training and certification of that dog, field performance records, and evidence concerning the experience and training of the officer handling the dog, as well as any other objective evidence known to the officer about the dog’s reliability in being able to detect the presence of illegal substances within the vehicle. To adopt the contrary view that the burden is on the defendant to present evidence of the factors other than certification and training in order to demonstrate that the dog is unreliable would be contrary to the well-established proposition that the burden is on the State to establish probable cause for a warrant-less search. In addition, since all of the records and evidence are in the possession of the State, to shift the burden to the defendant to produce evidence of the dog’s unreliability is unwarranted and unduly burdensome. Accordingly, we quash Harris and disapprove Coleman and Laveroni. We approve Gibson and Matheson to the extent they are consistent with this opinion.
FACTS
In July 2006, the State charged Clayton Harris with possession of the listed chemical pseudoephedrine with intent to use it to manufacture methamphetamine, more commonly known as meth, in violation of section 893.149(l)(a), Florida Statutes (2006). Harris subsequently moved to suppress seized evidence, including the pseudoephedrine, arguing that it was found pursuant to an illegal search of his truck.
At the hearing on the motion to suppress, the evidence established that on June 24, 2006, Liberty County Sheriffs Canine Officer William Wheetley and his drug-detection dog, Aldo, were on patrol. Officer Wheetley conducted a traffic stop of Harris’s truck after confirming that *760 Harris’s tag was expired. Upon approaching the truck, Officer Wheetley noticed that Harris was shaking, breathing rapidly, and could not sit still. Officer Wheet-ley also noticed an open beer can in the cup holder. When Officer Wheetley asked for consent to search the truck, Harris refused. Officer Wheetley then deployed Aldo. Upon conducting a “free air sniff’ of the exterior of the truck, Aldo alerted to the door handle of the driver’s side.
Underneath the driver’s seat, Officer Wheetley discovered over 200 pseu-doephedrine pills in a plastic bag wrapped in a shirt. On the passenger’s side, Officer Wheetley discovered eight boxes of matches containing a total of 8000 matches. Officer Wheetley then placed Harris under arrest. A subsequent search of a toolbox on the passenger side revealed muriatic acid. Officer Wheetley testified that these chemicals are precursors of methamphetamine. After being read his Miranda[3] rights, Harris stated that he had been cooking meth for about one year and most recently cooked it at his home in Blountstown two weeks prior to the stop. Harris also admitted to being addicted to meth and needing it at least every few days.
As of the day that Officer Wheetley searched Harris’s truck, Officer Wheetley had been a law enforcement officer for three years and had been a canine handler since 2004. In January 2004, Aldo completed a 120-hour drug detection training course at the Apopka Police Department with his handler at the time, Deputy Sher-riff William Morris. In February 2004, Aldo was certified with Morris as a drug-detection dog by Drug Beat K-9 Certifications. Aldo is trained and certified to detect cannabis, cocaine, ecstasy, heroin, and methamphetamine. Aldo is not trained to detect alcohol or pseudoephed-rine. Although Officer Wheetley testified that pseudoephedrine is a precursor of meth, there was no testimony on whether a dog trained to detect and alert to meth would also detect and alert to pseu-doephedrine.
In July 2005, Aldo and Officer Wheetley became partners. In February 2006, they completed a forty-hour training seminar with the Dothan Police Department. Officer Wheetley testified that he and Aldo complete this seminar annually. Additionally, Officer Wheetley trains Aldo four hours per week in detecting drugs in vehicles, buildings, and warehouses. For example, Officer Wheetley may take Aldo to a wrecker yard and plant drugs in six to eight out of ten vehicles. Officer Wheetley then takes Aldo and performs a “W pattern, up, down, up, down.”
Aldo must alert to the vehicles with drugs, and he is rewarded for an accurate alert. Officer Wheetley described Aldo’s success rate during training as “really good.” Aldo’s training records, which Officer Wheetley began keeping in November 2005, were introduced in evidence. These records reveal that on a performance level of either satisfactory or unsatisfactory, Aldo performed satisfactory 100% of the time. However, Officer Wheetley did not explain whether a satisfactory performance includes any alerts to vehicles where drugs were not placed.
Officer Wheetley also testified that in Florida a single-purpose dog, such as one trained only to detect drugs, is not required by law to carry certification. These dogs are required to show proficiency only in locating drugs. By contrast, a dual-purpose dog, such as one trained in apprehension and drug detection, must carry Florida Department of Law Enforcement (FDLE) certification. Florida does not *761 have a set standard for certification for single-purpose drug dogs, such as Aldo.
With regard to Aldo’s performance in the field, Officer Wheetley testified that he deploys Aldo approximately five times per month. Officer Wheetley maintains records of Aldo’s field performance only when Officer Wheetley makes an arrest. Officer Wheetley testified that he does not keep records of Aldo’s alerts in the field when no contraband is found; he documents only Aldo’s successes. These records were neither produced prior to the hearing nor introduced at the hearing.[4] Thus, it is impossible to determine what percentage of time Aldo alerted and no contraband was found following a warrantless search of the vehicle.
Harris introduced evidence of a specific instance of Aldo’s field performance to support his position that Aldo is unreliable involving this same vehicle and same defendant. About two months after the June 24 stop, Officer Wheetley stopped Harris again for a traffic infraction.[5] On this stop, Officer Wheetley again deployed Aldo, who alerted to the same driver’s side door handle. A subsequent search of the truck revealed only an open bottle of liquor and no illegal substances.
Officer Wheetley testified to the issue of residual odors. According to Officer Wheetley, Aldo can pick up residual odors of illegal drugs on an object when, for example, someone has the odor on his or her hand and touches a door handle. When asked how long a residual odor can remain on the handle, Officer Wheetley stated that he was not qualified to answer that question.
Regarding the alert in this case, Officer Wheetley testified that Aldo presumably alerted to residual odor of meth on the door handle, indicating that Officer Wheet-ley did not believe that Aldo alerted to any of the substances found in the vehicle. Officer Wheetley testified on cross-examination:
Officer Wheetley: [W]hen my dog alerts to a door handle, it usually means, in the cases which I have worked in the past, that somebody has either touched the narcotics or have smoked narcotics, the odor is on them hand when they touched the door handle is when the odor transfer occurs. And that’s when my dog will pick up on the residual odor of the narcotics.
Defense Counsel: So you have no idea— do you know how long ago somebody might have touched that vehicle?
Officer Wheetley: Ma’am, you’re asking me a question for an expert. I don’t feel comfortable answering that.
Defense Counsel: Do you know whether it could have been someone other than the person driving the vehicle?
Officer Wheetley: I can’t answer that question, ma’am....
[[Image here]]
Officer Wheetley: The residual odor is there. That’s what caused my dog to show the response. So if it’s there, my dog responded to the odor, so which— apparently the odor was there.
*762 Defense Counsel: But you have no way of establishing in this case that this is not just a false alert by your dog?
Officer Wheetley: Ma’am, we found the precursors to methamphetamine, all the listed chemicals were in the truck. He admitted to not being able to go more than two days without using. I think that pretty much places the odor on the door handle.
Defense Counsel: The dog, however, did not alert to any of the things he has been trained to alert to as far as your knowledge?
Officer Wheetley: Ma’am, he was trained to alert to the odor of narcotics, which he alerted to the odor of narcotics on the door handle.
After both parties rested, the State argued that Officer Wheetley had probable cause based on the totality of the circumstances, which included the expired tag, open container, nervousness, and an alert by a trained and certified drug-detection dog. In challenging the issue of probable cause, the defense argued that the State failed to establish Aldo’s reliability. According to the defense, any dog can be trained, but what matters most is that the dog obtains positive results in the field. The defense focused on the fact that on two occasions (once on June 24, the stop at issue, and once after the stop at issue) Aldo alerted to Harris’s truck and no drugs were found that Aldo was trained to detect.
In an oral ruling, the trial court denied the motion to suppress, found that there was probable cause to search Harris’s truck, and admitted the physical evidence seized. The trial court did not make a finding as to the dog’s reliability or any other factual findings.
Harris then entered a plea of no contest, reserving the right to appeal the denial of the motion. He was sentenced to twenty-four months’ incarceration and five years of probation. On appeal, the First District affirmed. Harris subsequently petitioned this Court for discretionary review, which we accepted based on express and direct conflict between the First and Second Districts.
THE CONFLICT ISSUE
The question presented to the First District — and now to this Court — concerns the evidence that the State must introduce to establish that probable cause existed for the warrantless search of a vehicle based on a drug-detection dog’s alert to the vehicle. To clarify the conflict, we will outline the approaches adopted by the First, Second, Fourth, and Fifth District Courts of Appeal, which have all addressed this issue.
The First, Fourth, and Fifth Districts agree that the State can establish probable cause to search a vehicle by demonstrating that a dog is properly trained and certified to detect illegal drugs. See Harris, 989 So.2d at 1215; Laveroni, 910 So.2d at 336; Coleman, 911 So.2d at 261. None of the courts address what would constitute “proper training and certification,” nor do they address the fact that there is no statewide certification for single-purpose drug-detection dogs. These districts do not consider field performance records to be irrelevant; their position is that if the defendant wishes to challenge the reliability of the dog, it is the defendant’s burden to introduce field performance records of the dog or other evidence, such as expert testimony.
In Laveroni, the defendant moved to suppress illegal drugs found pursuant to a warrantless search of his car. 910 So.2d at 334. The illegal drugs were found after the defendant was stopped for reckless driving and a drug-detection dog alerted to the driver’s open window. Id. The trial court, on its own and after the parties *763 rested, “raised the issue of whether there was sufficient proof that the narcotics dog was qualified so as to establish probable cause.” Id. Because there was no evidence presented as to the dog’s qualifications, the trial court granted the motion to suppress. Id. at 335. The Fourth District reversed and remanded because the State was not put on notice that the dog’s qualifications would be at issue. Id. In the event that the issue would be raised on remand, the Fourth District explained:
[T]he state can make a prima facie showing of probable cause based on a narcotic dog’s alert by demonstrating that the dog has been properly trained and certified. If the defendant wishes to challenge the reliability of the dog, he can do so by using the performance records of the dog, or other evidence, such as expert testimony.
Id. at 336. The court found support in United States v. Diaz, 25 F.3d 392, 394 (6th Cir.1994), which held that evidence of training and certification was sufficient to establish probable cause but that evidence of the reliability of the dog’s performance was also admissible to rebut the State’s prima facie showing of reliability. Laveroni, 910 So.2d at 336.
In Coleman, the State challenged the trial court’s orders granting motions to suppress drugs found in vehicles after a drug-detection dog’s alert indicated that drugs were present in the vehicles. 911 So.2d at 260. Although the State had introduced evidence that the dog had been trained and certified to detect illegal drugs, the State failed to produce evidence of the dog’s field performance records. Id. The trial court concluded that without evidence of the dog’s field performance, the State failed to establish probable cause. Id. Relying on Laveroni, the Fifth District reversed and held that “the State made a prima facie showing of probable cause” by introducing evidence that the dog was trained and certified to detect illegal drugs. Coleman, 911 So.2d at 261. Accordingly, the court held that “it was error to grant the motions to suppress.” Id. In Harris, citing to Laveroni and Coleman, the First District aligned itself with the Fourth and Fifth Districts. Harris, 989 So.2d at 1215.
The Second District has reached the opposite conclusion on similar facts. According to the Second District, in Matheson, 870 So.2d at 14, “the fact that a dog has been trained and certified, standing alone, is insufficient to give officers probable cause to search based on the dog’s alert.” The Second District reasoned that “[a]n officer who knows only that his dog is trained and certified, and who has no other information, at most can only suspect that a search based on the dog’s alert will yield contraband. Of course, mere suspicion cannot justify a search.” Id. at 13. Thus, the Second District concluded that “the most telling indicator of what the dog’s behavior means is the dog’s past performance in the field.” Id. at 15.
The Second District also discussed the issue of residual odors:
[I]n this case Razor’s trainer acknowledged the tendency of narcotics detection dogs to alert on the residual odors of drugs that are no longer present.
This underscores one of three central reasons why the fact that a dog has been trained, standing alone, is not enough to give an officer probable cause to search based on the dog’s alert. Razor’s trainer acknowledged that a trained dog, doing what he has been conditioned to do, imparts to the officer merely that he detects the odor of contraband. To be sure, as the trainer maintained, this may not be a false alert when assessing the success of the dog’s conditioning. But for Fourth Amendment purposes it is neither false nor positive. The presence of a drug’s odor at an intensity detecta *764 ble by the dog, but not by the officer, does not mean that the drug itself is present.
Id. at 13. The Second District then enunciated concerns with relying solely on evidence that the dog was trained or “conditioned” to respond in particular ways to particular stimuli:
Although we commonly refer to the “training” of dogs, manifestly they are not trained in the sense that human beings may be trained. It is not a process of imparting knowledge and skills that dogs want or need. However much we dog lovers may tend to anthropomor-phize their behavior, the fact is that dogs are not motivated to acquire skills that will assist them in their chosen profession of detecting contraband. Rather, dogs are “conditioned,” that is, they are induced to respond in particular ways to particular stimuli. For law enforcement purposes, the ideal conditioning would yield a dog who always responds to specified stimuli in a consistent and recognizable way, yet never responds in that manner absent the stimuli. But this does not happen. While dogs are not motivated in ways that humans are, neither can they be calibrated to achieve mechanically consistent results.
Id. at 13-14.
In this regard, the Second District highlighted that “conditioning and certification programs vary widely in them methods, elements, and tolerances of failure.” Id. at 14. The Second District then contrasted the highly rigorous training and certification program of the United States Customs Service to the training in Matheson, where the dog and handler had undergone only one initial thirty-day certification program and one week-long annual recertifi-cation. See id. Finally, the Second District noted that dogs themselves “vary in their abilities to accept, retain, or abide by their conditioning in widely varying environments.” Id. In rejecting the proposition that evidence of training and certification alone is sufficient to give probable cause to search based on the dog’s alert, the Second District held that multiple factors should be considered, including the exact training received, the criteria for selecting the dogs in the program, the standards the dog was required to meet to successfully complete the training program, and the “track record” of the dog in the field, with an emphasis on the number of mistakes the dog has made. See id. at 14-15 (quoting State v. Foster, 390 So.2d 469, 470 (Fla. 3d DCA 1980)).
In Gibson, 968 So.2d at 631, the Second District held that the State had failed to establish that the drug-detection dog’s alert provided probable cause for the search. The Second District, citing Matheson, reiterated that “[t]o demonstrate that an alert by a narcotics detection dog is sufficiently reliable to furnish probable cause to search, the State must introduce evidence of the dog’s ‘track record’ or performance history.” Id. (citing Matheson, 870 So.2d at 14). In that case, the dog’s handler had testified that the dog was certified and had completed 400 hours of training. Id. at 631-32. However, the State “failed to elicit any testimony from him regarding the dog’s track record” in the field; although the “officer admitted that drugs are not always found when the dog alerts, ... he could not quantify the percentage of false alerts.” Id. at 632. The Second District concluded that, under Matheson, the officer’s testimony was inadequate to establish the dog’s reliability. Id.
As explained in our analysis below, we agree with the Second District’s bottom-line conclusion that the State cannot establish probable cause by introducing evidence only that the dog was trained and *765 certified. We disapprove of the conclusions of the First, Fourth, and Fifth Districts that the State can meet its burden of establishing probable cause by presenting evidence that the dog is trained and certified to detect illegal drugs and then shifting the burden to the defendant to counter this evidence.
ANALYSIS
As previously stated, the question presented concerns the showing that the State must make to establish probable cause for a warrantless search of a vehicle based on a drug-detection dog’s alert to the vehicle. This issue involves a trial court’s determination of the legal issue of probable cause, which we review de novo. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Pagan v. State, 830 So.2d 792, 806 (Fla.2002). However, we defer to a trial court’s findings of historical fact as long as they are supported by competent, substantial evidence. See Connor v. State, 803 So.2d 598, 608 (Fla.2001).
The Fourth Amendment to the United States Constitution provides that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” U.S. Const, amend. IV; see also art. I, § 12, Fla. Const. “[Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.” Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).
One such exception to the warrant requirement is the “automobile exception,” first established by the United States Supreme Court in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In Carroll, the United States Supreme Court held that a warrantless search of a vehicle based upon probable cause to believe that the vehicle contains contraband is not unreasonable within the meaning of the Fourth Amendment. Id. at 149, 45 S.Ct. 280; see also Maryland v. Dyson, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (stating that the automobile exception permits police to search a vehicle if probable cause exists to believe it contains contraband). The automobile exception of not requiring a warrant is based on the inherent mobility of vehicles, as well as the reduced expectation of privacy in a vehicle. Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). Although an individual has a “reduced expectation of privacy in an automobile, owing to its pervasive regulation,” id., he or she “does not surrender all the protections of the Fourth Amendment by entering an automobile,” New York v. Class, 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). “A search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search.” United States v. Ortiz, 422 U.S. 891, 896, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (footnote omitted). The cases make clear that probable cause to search a vehicle is based on the same facts that would justify the issuance of a warrant. See Dyson, 527 U.S. at 467, 119 S.Ct. 2013. “The scope of a warrantless search based on probable cause is no narrower — and no broader — than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize.” United States v. Ross, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).
*766 The United States Supreme Court has explained that the probable cause standard “depends on the totality of the circumstances.” Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). “Probable cause exists when ‘there is a fair probability that contraband or evidence of a crime will be found in a particular place.’ ” United States v. Grubbs, 547 U.S. 90, 95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) (emphasis added) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). “[PJrobable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.” Pringle, 540 U.S. at 370-71, 124 S.Ct. 795 (alteration in original) (quoting Gates, 462 U.S. at 232, 103 5.Ct. 2317). Probable cause is a “‘practical, nontechnical conception’ that deals with ‘the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.’ ” Id. at 370, 124 S.Ct. 795 (quoting Gates, 462 U.S. at 231, 103 S.Ct. 2317).
This Court, obliged to follow precedent from the United States Supreme Court, has explained:
An examination of Supreme Court jurisprudence reveals a decidedly broad definition of when law enforcement officers have the authority to engage in a war-rantless search:
Probable cause exists where “the facts and circumstances within their (the officers’) knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that” an offense has been or is being committed.
State v. Betz, 815 So.2d 627, 633 (Fla.2002) (quoting Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). The burden is on the State to demonstrate that the police had probable cause to conduct a warrantless search. See Doctor v. State, 596 So.2d 442, 445 (Fla.1992); see also Hilton v. State, 961 So.2d 284, 296 (Fla.2007) (“When a search or seizure is conducted without a warrant, the government bears the burden of demonstrating that the search or seizure was reasonable.”).
When it comes to the use of drug-detection dogs, the United States Supreme Court has explained that “the use of a well-trained narcotics-detection dog — one that ‘does not expose noncontraband items that otherwise would remain hidden from public view,’ — during a lawful traffic stop, generally does not implicate legitimate privacy interests.” Caballes, 543 U.S. at 409, 125 S.Ct. 834 (citation omitted) (quoting Place, 462 U.S. at 707, 103 S.Ct. 2637).[6] Caballes and Place considered the issue of whether the use of a “well-trained” drug-detection dog constitutes a search and not the circumstances of how the trial court determines whether the drug-detection dog is well-trained and when the dog’s alert will constitute probable cause to believe that there are illegal substances within the vehicle.
*767 Because the dog cannot be cross-examined like a police officer whose observations at the scene may provide the basis for probable cause, the trial court must be able to assess the dog’s reliability by evaluating the dog’s training, certification, and performance, as well as the training and experience of the dog’s handler. Similar to situations where probable cause to search is based on the information provided by informants, the trial court must be able to evaluate the reliability of the dog based on a totality of circumstances. See Gates, 462 U.S. at 230-31, 103 S.Ct. 2317. A critical part of the informant’s reliability is the informant’s track record of giving accurate information in the past.[7]
Like the informant whose information forms the basis for probable cause, where the dog’s alert is the linchpin of the probable cause analysis, such as in this case, the reliability of the dog to alert to illegal substances within the vehicle is crucial to determining whether probable cause exists. If a dog is not a reliable detector of drugs, the dog’s alert in a particular case, by itself, does not indicate that drugs are probably present in the vehicle. In fact, if the dog’s ability to alert to the presence of illegal substances in the vehicle is questionable, the danger is that individuals will be subjected to searches of their vehicles and their persons without probable cause. Conversely, if a dog is a reliable detector of drugs, the dog’s alert in a particular case can indicate that drugs are probably present in the vehicle. In those circumstances, the drug-detection dog’s alert will indicate to the officer that there is a “fair probability that contraband” will be found. Gates, 462 U.S. at 238, 103 S.Ct. 2317. Thus, to determine whether the officer has a reasonable basis for concluding that the dog’s alert indicates a fair probability that contraband will be found, the trial court must be able to adequately make an objective evaluation of the reliability of the dog.
We conclude that when a dog alerts, the fact that the dog has been trained and certified is simply not enough to establish probable cause to search the interior of the vehicle and the person. We first note that there is no uniform standard in this state or nationwide for an acceptable level of training, testing, or certification for drug-detection dogs. In contrast to dual-purpose drug-detection dogs, which are appar *768 ently certified by FDLE, no such required certification exists in this state for dogs like Aldo, who is a single-purpose drug-detection dog.
In the absence of a uniform standard, the reliability of the dog cannot be established by demonstrating only that a canine is trained and certified. “[S]imply characterizing a dog as ‘trained’ and ‘certified’ imparts scant information about what the dog has been conditioned to do or not to do, or how successfully.” Matheson, 870 So.2d at 14. In other words, whether a dog has been sufficiently trained and certified must be evaluated on a case-by-case basis. For example, in a decision from the United States Court of Appeals for the Eleventh Circuit, the court described a dog as a “highly trained and credentialed professional whose integrity and objectivity are beyond reproach” because it had graduated from the U.S. Canine Academy and Police Dog Training Center, had been certified by the National Narcotics Detector Dog Association, and was described by one trainer as “probably one of the best dogs he had trained in the 23 years he had been doing it.” United States v. $242,484.00, 389 F.3d 1149, 1159, 1165 (11th Cir.2004).
One commentator has described the “ ‘mythic infallibility’ of the dog’s nose”:
In cases involving dog sniffing for narcotics it is particularly evident that the courts often accept the mythic dog with an almost superstitious faith. The myth so completely has dominated the judicial psyche in those cases that the courts either assume the reliability of the sniff or address the question cursorily; the dog is the clear and consistent winner.
Andrew E. Taslitz, Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup, 42 Hastings L.J. 15, 22, 28 (1990). Another commentator has noted that “not all dogs are well-trained and well-handled, nor are all dogs temperamentally suited to the demands of being a working dog. Some dogs are distractible or suggestible, and may alert improperly. Many factors may lead to an unreliable alert.” Richard E. Myers II, Detector Dogs and Probable Cause, 14 Geo. Mason L.Rev. 1, 4 (2006).
Second, and related to the first concern, any presumption of reliability based only on the fact that the dog has been trained and certified does not take into account the potential for false alerts, the potential for handler error, and the possibility of alerts to residual odors. As the Second District aptly observed, “[a]n officer who knows only that his dog is trained and certified, and who has no other information, at most can only suspect that a search based on the dog’s alert will yield contraband. Of course, mere suspicion cannot justify a search.” Matheson, 870 So.2d at 13.
“A false [alert] is an alert by the dog in the absence of the substance it is trained to detect.” Myers, supra, at 12. False alerts may lead to the search of a person who is innocent of any wrongdoing. Id. Cases demonstrate that the false-alert rate among certified detection dogs varies significantly. Lewis R. Katz & Aaron P. Golembiewski, Curbing the Dog: Extending the Protection of the FouHh Amendment to Police Drug Dogs, 85 Neb. L.Rev. 735, 757 (2007).
Coupled with the concern for false alerts is the potential for handler error and handler cuing. “Handler error affects the accuracy of a dog. The relationship between a dog and its handler is the most important element in dog sniffing, providing unlimited opportunities for the handler to influence the dog’s behavior.” Id. at 762. Therefore, the trial court must also focus on the training of the handler. “Handlers interpret their dogs’ signals, and the handler alone makes the final decision whether a dog has detected narcotics. Practi *769 tioners in the field reveal that handler error accounts for almost all false detections.” Robert C. Bird, An Examination of the Training and Reliability of the Narcotics Detection Dog, 85 Ky. L.J. 405, 425 (1997).
A related problem is the possibility of handler cuing. “Even the best of dogs, with the best-intentioned handler, can respond to subconscious cuing from the handler. If the handler believes that contraband is present, they may unwittingly cue the dog to alert regardless of the actual presence or absence of any contraband. Finally, some handlers may consciously cue their dog to alert to ratify a search they already want to conduct.” Myers, supra, at 5 (footnote omitted).
An alert to a residual odor is different from a false alert, although both types of alerts may result in subjecting the person and vehicle to an invasive search when no contraband is actually present. Because of the sensitivity (or hypersensitivity) of a dog’s nose, a dog may alert to a residual odor, which may not indicate the presence of drugs in the vehicle at the time of the sniff:
Given the level of sensitivity that many dogs possess, it is possible that if the person being searched had attended a party where other people were using drugs, the dog would alert because of the residue on clothing or fabric. It is possible that in a vehicle that had formerly been used to transport drugs, the dog would alert, despite the fact that drugs were no longer present. Or it is possible that some sort of residue normally associated with drugs was present.
Myers, supra, at 4-5 (footnotes omitted). Therefore, the alert may not even mean that drugs were ever present in the vehicle or on the person.
Because of these variables, a necessary part of the totality of the circumstances analysis in a given case regarding the dog’s reliability is an evaluation of the evidence concerning whether the dog in the past has falsely alerted, indicating that the dog is not well-trained, or whether the alerts indicate a dog who is alerting on a consistent basis to residual odors, which do not indicate that drugs are present in the vehicle. Accordingly, evidence of the dog’s performance history in the field — and the significance of any incidents where the dog alerted without contraband being found— is part of a court’s evaluation of the dog’s reliability under a totality of the circumstances analysis.[8] In particular, when assessing the factors bearing on the dog’s reliability, it is important to include, as part of a complete evaluation, how often the dog has alerted in the field without illegal contraband having been found.
The State argues that records of field performance are meaningless because dogs do not distinguish between residual odors and drugs that are present and, thus, alerts in the field without contraband having been found are merely unverified alérts, not false alerts. This assertion, if correct, raises its own set of concerns as it relates to a probable cause determination of whether the dog’s alert indicates a fair probability that there are drugs presently inside the vehicle.
In any event, the record in this case does not contain any testimony as to whether dogs can be trained to distinguish between residual odors and drugs and, further, there were no field records or testimony presented in this case in order to allow for a careful examination of the significance of field performance. Officer Wheetley was unable to testify as to a *770 complete picture of Aldo’s performance in the field. In future cases, the State can explain the significance of the percentage of unverified alerts in the field. The trial court would then be able to evaluate how any inability to distinguish between residual odors and drugs that are actually present bears on the reliability of the alert in establishing probable cause.
Finally, to adopt the view of the First, Fourth, and Fifth Districts would be to place the burden on the defendant to uncover all records and evidence that might challenge a presumption of reliability — evidence that is exclusively within the control of law enforcement authorities and, further, evidence that law enforcement agencies may choose not to record, such as in this case.[9] Placing this burden on the defendant is contrary to the well-established proposition that the burden is on the State to establish probable cause for a warrantless search. See Doctor, 596 So.2d at 445. Because the State must establish that the officer has a reasonable basis for believing that his or her dog is reliable in order to prove probable cause based on the dog’s alert, the State carries the burden of presenting the necessary records and evidence for the trial court to consider in adequately evaluating the dog’s reliability-
Some courts have adopted a similar totality of the circumstances approach to determining a dog’s reliability. For example, in State v. Nguyen, 726 N.W.2d 871, 876-77 (S.D.2007), the defendant asserted that the dog’s field activity report reflected the dog’s unreliability. The South Dakota Supreme Court stated that while the “apparently false indications [gave it] pause, ... [it did] not believe these field reports should be relied on, standing alone, in measuring [the dog’s] reliability.” Id. at 877. The court explained:
In our view, trial courts making drug dog reliability determinations may consider a variety of elements, including such matters as the dog’s training and certification, its successes and failures in the field, and the experience and training of the officer handling the dog. Under the totality of the circumstances, the court can then weigh each of these factors.

Id.

Further, other courts have endorsed the trial court’s consideration of multiple factors, with emphasis on the number of “false alerts” by the dog. For instance, in State v. England, 19 S.W.3d 762, 768 (Tenn.2000), the Tennessee Supreme Court rejected a per se rule that probable cause may be established through a positive alert by a trained narcotics detection dog. The court reasoned that the probable cause determination should turn on the dog’s reliability and that the trial court should ensure that the dog is reliable by making factual findings. Id. The court set forth the following framework for this required reliability determination:
Accordingly, in our view, the trial court, in making the reliability determination may consider such factors as: the canine’s training and the canine’s “track record,” with emphasis on the amount of false negatives and false positives the dog has furnished. The trial court should also consider the officer’s train *771 ing and experience with this particular canine.

Id.

Additionally, in United States v. Florez, 871 F.Supp. 1411, 1420-21 (D.N.M.1994), the United States District Court for the District of New Mexico observed that certified dogs have falsely alerted and found the fact that a dog is certified should not be sufficient to establish probable cause. While analogizing to an informant's tip, the court set forth the following framework for a probable cause analysis:
In summary, where adequate and comprehensive records are maintained on a particular narcotics dog, and include results of controlled alerts made in training, as well as actual alerts in the field, the dog’s reliability could be sufficiently established either through the records themselves or testimony from the dog’s trainer who maintained the records. In this respect, the dog’s alert is analogous to information provided by a reliable informant, and his alert without more could establish probable cause.
However, where records are not kept or are insufficient to establish the dog’s reliability, an alert by such a dog is much like hearsay from an anonymous informant, and corroboration is necessary to support the unproven reliability of the alerting dog and establish probable cause. To accept less would compromise the very principles that the requirement of probable cause was designed to protect.
Id. at 1424. The court found support for this position from United States v. Nielsen, 9 F.3d 1487, 1491 (10th Cir.1993), wherein the Tenth Circuit stated, “If this were a case of an alert by a trained drug sniffing dog with a good record, we would not require corroboration to establish probable cause.” In sum, if the court relies only on training and certification records and fails to consider other factors concerning the dog’s performance, then the court does not have a complete picture of the numerous circumstances that necessarily bear on the reasonableness of the officer’s belief in the dog’s reliability and whether the dog’s alert in a particular case indicates a fair probability that there were drugs present inside the vehicle.
For the above reasons, we adopt a totality of the circumstances approach and hold that the State, which bears the burden of establishing probable cause, must present all records and evidence that are necessary to allow the trial court to evaluate the reliability of the dog. The State’s presentation of evidence that the dog is properly trained and certified is the beginning of the analysis. Because there is no uniform standard for training and certification of drug-detection dogs, the State must explain the training and certification so that the trial court can evaluate how well the dog is trained and whether the dog falsely alerts in training (and, if so, the percentage of false alerts). Further, the State should keep and present records of the dog’s performance in the field, including the dog’s successes (alerts where contraband that the dog was trained to detect was found) and failures (“unverified” alerts where no contraband that the dog was trained to detect was found). The State then has the opportunity to present evidence explaining the significance of any unverified alerts, as well as the dog’s ability to detect or distinguish residual odors. Finally, the State must present evidence of the experience and training of the officer handling the dog. Under a totality of the circumstances analysis, the court can then consider all of the presented evidence and evaluate the dog’s reliability.
Contrary to the dissent’s assertion that we “impose[ ] evidentiary requirements which can readily be employed to ensure that the police rely on drug detection dogs only when the dogs are shown to be virtually infallible,” dissenting op. at 776, we do *772 not hold in this case that the dog must be shown to be “virtually infallible.” Just as it would be entirely relevant to know how many times an informant’s tip resulted in contraband being discovered, the reason that the State should keep records of the dog’s performance both in training and in the field is so that the trial court may adequately evaluate the reasonableness of the officer’s belief in the dog’s reliability under the totality of the circumstances. Because the State bears the burden of establishing probable cause, if the courts are to make determinations of probable cause based on the alerts of dogs, who can neither be cross-examined nor otherwise independently assessed as to their reliability, it is appropriate to place the burden on the State to ensure uniformity in the way dogs are evaluated for reliability of their alerts. Nothing less than the sanctity of our citizens’ constitutional rights to be secure from unreasonable searches and seizures in their homes, them vehicles, and them persons is at stake.
THIS CASE
In applying these standards to Harris’s case, we hold that the trial court erred in concluding that the State presented sufficient evidence to establish probable cause to conduct a warrantless search of Harris’s truck. We defer to a trial court’s findings of fact as long as they are supported by competent, substantial evidence, but we review de novo a trial court’s application of the law to the historical facts. See Connor, 803 So.2d at 608; Pagan, 880 So.2d at 806. However, in this case, the trial court did not make findings of historical fact.
The State presented the following evidence: Aldo had been trained to detect drugs since January 2004 and certified to detect drugs since February 2004; Officer Wheetley trains Aldo for approximately four hours per week, deploys Aldo approximately five times per month, and attends a forty-hour annual training seminar; and Aldo’s success rate during training is “really good.” Aldo’s weekly training records reveal that from November 2005 to June 2006, Aldo performed satisfactorily 100% of the time. However, there was no testimony as to whether a satisfactory performance includes any false alerts. The record is also scarce on the details of Aldo’s training, including whether the trainer was aware of the locations of the drugs[10] and whether the training simulated a variety of environments and distractions.[11]
The State also did not introduce Aldo’s field performance records so as to allow an analysis of the significance of the alerts where no contraband was found. In fact, Officer Wheetley testified that he does not keep records of Aldo’s unverified alerts in the field; he documents only Aldo’s successes.[12] If an officer fails to keep records *773 of his or her dog’s performance in the field, the officer is lacking knowledge important to his or her belief that the dog is a reliable indicator of drugs. Cf. Florida v. J.L., 529 U.S. 266, 271, 273-74, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (concluding that police did not have reasonable suspicion based on an anonymous tip because the officers did not have sufficient information from the tip and were without means to test the informant’s credibility and thus the tip’s reliability, stating that “[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search”).
The State asserts that the only relevant records are the training records-not field records — since there is no such thing as a false alert in the field because a dog alerts to both actual drugs and residual odors. Thus, the State argues, when a dog alerts in the field and no contraband is found, there is no way to determine whether the dog was alerting to a residual odor or whether the dog falsely alerted. This is also of concern when probable cause for the search hinges on the dog’s demonstrated reliability and thus the probability that the dog’s alert indicates that contraband was present in the vehicle at the time of the alert. Because the State did not introduce field performance records, the State was not able to explain the significance of any unverified alerts in the field.
Further, the State failed to present any evidence regarding the criteria necessary for Aldo to obtain certification through Drug Beat K-9 certifications. This case is unlike Coleman, where evidence was introduced outlining the details of the training program, the criteria for choosing which dogs to use as drug dogs, and the criteria necessary for the dog and handler to pass the course and obtain “certification.” 911 So.2d at 260. By contrast, the only evidence regarding the criteria used in Aldo’s certification is a document simply stating that Aldo successfully found twenty-eight grams of marijuana, five grams of methamphetamine, twenty-eight grams of cocaine, seven grams of heroin, seven grams of crack cocaine, and fifty grams of ecstasy. However, the record is silent on the circumstances of the certification, such as whether these drugs were hidden, whether the trainer was aware of the locations of the drugs, or whether the certification simulated the variety of environments and distractions found in the field. In the absence of uniform, standard criteria for certification, the State must do more than simply introduce evidence that the dog has been certified.
In this case, there are several other factors that call into question Aldo’s reliability. First, the State failed to present any testimony regarding Aldo’s ability to detect residual odors. When asked how *774 long a residual odor can remain on the driver’s side door handle, Officer Wheetley stated that he was not qualified to answer that question. While such testimony is not required, without this information, it is difficult to determine how this factor should apply, if at all. For example, in State v. Cabral, 159 Md.App. 354, 859 A.2d 285, 300 (2004), the Maryland Court of Special Appeals held that even though testimony was presented that the dog could have alerted to a residual odor that was seventy-two hours old, “such an ability serves to strengthen the argument that the dog has a superior sense of smell on which to rely to support a finding of probable cause.” Alternatively, a trial court may find, after evaluating the testimony and other evidence, that a dog’s inability to distinguish between residual odors and actual drugs undermines a finding of probable cause.
Second, the State has failed to explain why an alert to a residual odor on the door handle would give rise to probable cause in this case. Officer Wheetley testified that Aldo alerted to the door handle and that, in his experience, this meant that somebody had touched or smoked narcotics and then transferred the odor to the door handle. Officer Wheetley further indicated that Aldo’s alert led him to believe that the odor of narcotics was present on the door handle. However, neither Officer Wheet-ley nor the State has explained in this case why evidence of residual odor of narcotics on the vehicle’s door handle gave rise to probable cause that there were drugs actually present in the vehicle at the time of the alert. Aldo’s alert to the door handle in this case, standing alone, provides no basis for an objective probable cause determination that drugs were present inside the vehicle.
Thus, we conclude that the State did not meet its burden in demonstrating that Officer Wheetley had a reasonable basis for believing that Aldo was reliable at the time of the search and, thus, that Aldo’s alert, the linchpin of the probable cause analysis in this case, indicated a fair probability that drugs would be found in the vehicle. Although the trial court found probable cause, the trial court did not make a specific finding as to Aldo’s reliability. The failure to make a finding on Aldo’s reliability makes it difficult to determine how much weight to give Aldo’s alert in the probable cause analysis.
Although not part of the determination of whether probable cause to conduct the search existed at that time, two additional facts in this case are illustrative of why it is important to engage in an inquiry of a dog’s reliability, including an evaluation of the dog’s performance in the field. First, as to the search in question, the police officer did not discover any drugs that Aldo was trained to detect. In other words, there is a chance that this ease may have involved a false alert. Second, Harris introduced evidence in this case that Aldo alerted to the same door handle on the same vehicle subsequent to this arrest and no drugs were found.
The State argues that the alert at issue in this case and the subsequent alert were not false alerts because Aldo was alerting to residual odor on the door handle; Officer Wheetley also testified that when a dog alerts to a door handle it usually means that residual odor was transferred to the door handle by someone who had handled drugs. However, an alert to residual odor on the door handle, by itself, indicates only that someone who has come into contact with drugs touched the door handle at some point.
In sum, we conclude that the State has failed to meet its burden of establishing probable cause. In the absence of a reliable alert, the other factors considered in the totality of circumstances *775 analysis — Harris’s expired tag, Harris’s shaking, breathing rapidly, and inability to sit still, and Harris’s open beer can — do not rise to the level of probable cause that there were illegal drugs inside the vehicle. Accordingly, the search of the vehicle violated the Fourth Amendment’s prohibition on unreasonable searches and seizures.
CONCLUSION
For the above reasons, we quash Harris and disapprove Coleman and Laveroni We approve Gibson and Matheson to the extent that they are consistent with this opinion. We hold the fact that a drug-detection dog has been trained and certified to detect narcotics, standing alone, is not sufficient to demonstrate the reliability of the dog. To demonstrate that an officer has a reasonable basis for believing that an alert by a drug-detection dog is sufficiently reliable to provide probable cause to search, the State must present evidence of the dog’s training and certification records, an explanation of the meaning of the particular training and certification, field performance records (including any unverified alerts), and evidence concerning the experience and training of the officer handling the dog, as well as any other objective evidence known to the officer about the dog’s reliability. The trial court must then assess the reliability of the dog’s alert as a basis for probable cause to search the vehicle based on a totality of the circumstances. Because in this case the totality of the circumstances does not support a probable cause determination, the trial court should have granted the motion to suppress. We remand for proceedings consistent with this opinion.
It is so ordered.
LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., dissents with an opinion.
POLSTON, J., recused.

. The issue in this case is not whether a dog's sniff of the exterior of a vehicle constitutes a search. That has been answered by the United States Supreme Court. See Illinois v. Caballes, 543 U.S. 405, 407-08, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (holding that a canine sniff of an automobile need not be justified by reasonable articulable suspicion of drug activity); City of Indianapolis v. Edmond, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (recognizing that a canine sniff of an automobile is not a search); see also United States v. Place, 462 U.S. 696, 706-07, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (holding that a canine sniff of luggage does not constitute a search).

. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. At the hearing, defense counsel argued that the State withheld discovery by failing to produce these records. The State responded that it provided everything it had. Officer Wheet-ley stated that when the defense asked him to produce the records and certification, he believed the defense was referring to Aldo s training and certification, not field perform-anee records. The trial court did not find a discovery violation. Harris does not challenge that ruling in this review proceeding,

. here was testimony that this stop occurred within four to six weeks before the suppres-skm hearing on October 12, 2006, which means that the stop occurred between late August and mid-September 2006.

. We note that the United States Supreme Court appears to have equated a "well-trained” drug-detection dog with one who "does not expose noncontraband items that otherwise would remain hidden from public view.” Caballes, 543 U.S. at 408-09, 125 S.Ct. 834; Place, 462 U.S. at 707, 103 S.Ct. 2637. The danger of a dog not being well-trained is that the dog may expose noncontra-band items to public view. In this sense, a well-trained dog is a reliable dog. Further, a well-trained dog is not necessarily a dog that has merely been trained and certified: the best way of evaluating whether a dog is in fact "well-trained,” or reliable, is to evaluate the totality of the circumstances, including the dog’s training, certification, and performance.

. See, e.g., McCray v. Illinois, 386 U.S. 300, 303, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967) (“Jackson testified that he had been acquainted with the informant for approximately a year, that during this period the informant had supplied him with information about narcotics activities ‘fifteen, sixteen times at least,’ that the information had proved to be accurate and had resulted in numerous arrests and convictions. On cross-examination, Jackson was even more specific as to the informant’s previous reliability, giving the names of people who had been convicted of narcotics violations as the result of information the informant had supplied.”); State v. Peterson, 739 So.2d 561, 564 (Fla.1999) ("Officer NeSmith stated in his affidavit that the informant ‘has provided information to law enforcement on at least twenty occasions regarding illegal criminal activities occurring in Escambia County, Florida that has proven to be accurate and true.’ Generally, this level of previous contact is sufficient to establish veracity."); State v. Butler, 655 So.2d 1123, 1130 (Fla.1995) ("In this case, we have an informant whose veracity (i.e., credibility and reliability) is unquestioned. Officer Putnam had used information from this informant at least 20 times, and 60 to 70% of the tips resulted in felony arrests. As the district court acknowledged, the informant's reliability is 'fairly well established.’ ”); see also 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.3 (4th ed. 2004) (“When the police undertake to establish the credibility of an informant as a part of their task of establishing that probable cause exists for an arrest or search made or to be made exclusively or primarily upon that informant’s stoiy, they invariably, do so by referring to the past performance of that informant.”).

. "Information that merely tallies successes does not provide a complete picture. Well-presented data should include the number of failures, if any, and the conditions under which they occurred.” Bird, supra, at 432.

. As stated by Justice Lewis in his special concurrence in Jardines v. State, 73 So.3d 34, 2011 WL 1405080 (Fla.2011): "The complete lack of a uniform or standardized system of certifying drug detection canines renders it unduly burdensome for a defendant to challenge the validity of [a] ... dog sniff ... that results in an arrest.” 73 So.3d at 60-61 (Lewis, J., specially concurring). This burden is made especially difficult by the disparity among various training, testing, and certification programs.

. See Bird, supra, at 424 (examining the potential for handler cues and suggesting that these cues can be "corrected in training by conducting practice sniffs where both the dog and handler do not know where the drugs are located”).

. See, e.g., Bird, supra, at 413 (describing training procedures of the Rhode Island State Police: "During training exercises, trainers use distractions to test the dog's skill under adverse conditions. Officers will conduct tests, for example, near a noisy airplane or in a fish market, where distracting sounds or scents dominate the area.” (footnotes omitted)); id. at 414 (describing training procedures of the United States Customs Service, which trains its dogs to "disregard potential distractions such as food, harmless drugs, and residual scents,” permitting "no false alerts and no missed drugs” (footnotes omitted)).

.Because the State did not introduce Aldo's field performance records, this Court does not have the benefit of quantifying Aldo's success rate in the field. See, e.g., United States v. Anderson, 367 Fed.Appx. 30, 32-33 (11th Cir.2010) (rejecting defendant’s argument that *773 probable cause was not established where dog could not distinguish between an odor and presence of narcotics because, even accepting the field performance statistics, the dog had a 55% accuracy rate in finding measurable amounts of drugs); United States v. Kennedy, 131 F.3d 1371, 1378 (10th Cir.1997) (finding that "a 70-80% success rate meets the liberal standard for probable cause” to issue a search warrant); United States v. Scarborough, 128 F.3d 1373, 1378 (10th Cir.1997) (holding that with an overall success rate of 92%, it was not clear error for the trial court to find that the dog was "a credible narcotics dog and that his alert adequately supports the finding of probable cause”); United States v. Huerta, 247 F.Supp.2d 902, 910 (S.D.Ohio 2002) (holding that a 65% accuracy rate, not counting instances involving trace amounts of narcotics or where handler assumed alert was to residual odor, was insufficient alone to justify probable cause determination based solely on the dog's alert); State v. Miller, 256 Wis.2d 80, 647 N.W.2d 348, 353 (App.2002) (concluding that where the dog had accurately indicated presence of illegal contraband or substances on thirty-five of forty occasions (87.5%), the dog’s alert created probable cause).