**Opinion issued June 20, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00523-CR

————————————

**EDWARD DWAYNE HENRY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case No. 1315578**

---

## O P I N I O N

Appellant Edward Dwayne Henry was convicted by a jury of possession of cocaine, more than four grams but less than two hundred grams, with intent to deliver. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a), (d) (West 2010). After Henry pleaded true to a sentencing enhancement based on his prior felony

conviction for possession of a controlled substance with intent to deliver, the trial court sentenced him to twenty-five years' imprisonment. On appeal, Henry challenges the legal and factual sufficiency of the evidence and the trial court's denial of his pretrial motion to suppress. We affirm.

### Background

On August 4, 2011, officers from the Drug Enforcement Agency, including Special Agent James Wilson, and the Houston Police Department, including Officer Steve Bryant with the narcotics unit, Officer Mark Prendergrast with the gang unit, and Officer Griff Maxwell, a trained canine officer, executed a search warrant at Goodfellaz Master Barber Shop. Henry is listed as the owner of Goodfellaz Master Barber Shop in the assumed-name records of Harris County. The search warrant stated that Henry was suspected of possession and delivery of cocaine and authorized the officers to search Goodfellaz Master Barber Shop and seize any and all controlled substances, including but not limited to crack cocaine.

Upon arriving at the barbershop, Officer Bryant and other members of the HPD set up surveillance. Officer Bryant observed Henry sitting in a black Charger parked directly in front of the barbershop. Fifteen minutes after Officer Bryant arrived on the scene, the rest of the DEA and HPD officers arrived to execute the search. DEA agents parked their van in front of Henry's vehicle and entered the barbershop. Officer Prendergrast secured the outside area of the barbershop,

2

including Henry's vehicle. Officer Prendergrast secured Henry at the rear of his vehicle and patted Henry down for safety reasons. During the pat down, Officer Prendergrast discovered $7,000 in cash in Henry's pocket. Inside Henry's vehicle, officers discovered a small amount of marijuana, codeine, $1,700 in cash, and a semiautomatic pistol.

Agent Wilson and the other DEA agents entered the barbershop and observed eight barber stations along the left side of the wall. They saw two individuals at the third station, one individual at the fourth station, and one individual at the eighth station. The agents detained the individuals inside the barbershop, moved them outside, and initiated a search of the barbershop. Maxwell and his drug-detection dog, Rex, searched the interior of the barbershop. Rex alerted to the presence of narcotics at stations five, six, and seven. Officer Maxwell then hid the two stacks of money found in Henry's possession in different places outside and had Rex search the area outside the barbershop for the presence of narcotics. Rex alerted to the odor of narcotics in both areas.

Inside a cabinet at station five, officers discovered a Styrofoam cup that contained crack cocaine, powder cocaine, and some money. Amanda Phillips, a criminalist at the HPD Crime Laboratory, testified at trial that the substances found inside the Styrofoam cup were cocaine and had a combined weight of 52.9 grams. Officer Maxwell testified that the amount of cocaine found at station five was more

than what would be used for personal consumption and that the cookie form of crack would usually be cut up into smaller pieces and sold at $10 to $20 per piece. Officer Maxwell also testified that he estimated the monetary value of the cocaine at approximately $100 per gram.

The officers also discovered the following narcotics at other stations in the barbershop: (1) station one—3,475 grams of codeine; (2) station six—286 grams of codeine and 453 grams of marijuana; (3) station seven—481 grams of codeine, 11.8 grams of powder cocaine, 553 grams of marijuana, 780 hydrocodone pills, and 120 xanax pills; and (4) station eight—511 grams of marijuana and 73 grams of codeine. Agent Wilson testified that he checked each barber station for a barber's license to determine to whom the drugs belonged. Only three stations had licenses displayed, including station five, where Henry's barber's license was on display. In addition to Henry's license, a photograph of Henry with another individual was also found at station five.

Henry was arrested, charged with possession of cocaine with intent to deliver, and, following a jury trial, convicted. Henry appeals.

### Sufficiency of the Evidence

In his first and second points of error, Henry contends that the evidence was insufficient to support his conviction because the evidence presented at trial failed to establish that he knowingly possessed the cocaine. Henry argues that the State's

4

evidence, which he contends showed his mere presence near the scene, only amounted to a suspicion of his guilt, which is insufficient to support his conviction.

## A.     Standard of Review

An appellate court reviews legal and factual sufficiency challenges using the same standard of review.  *See Griego v. State*, 337 S.W.3d 902, 902 (Tex. Crim. App. 2011).  "Under this standard, evidence is insufficient to support a conviction if considering all record evidence in the light most favorable to the verdict, a factfinder could not have rationally found that each essential element of the charged offense was proven beyond a reasonable doubt."  *Gonzalez v. State*, 337 S.W.3d 473, 478 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)).  Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the acts alleged do not constitute the criminal offense charged.  *Gonzalez*, 337 S.W.3d at 479.  The sufficiency of the evidence is measured by the elements of the offense as defined in a hypothetically correct jury charge, which is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and

adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). If an appellate court finds the evidence insufficient under this standard, it must reverse the judgment and enter an order of acquittal. *Gonzalez*, 337 S.W.3d at 479.

An appellate court "determine[s] whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). When the record supports conflicting inferences, an appellate court presumes that the factfinder resolved the conflicts in favor of the verdict and defers to that resolution. *Id.* (citing *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793). "An appellate court likewise defers to the factfinder's evaluation of the credibility of the evidence and weight to give the evidence." *Gonzalez*, 337 S.W.3d at 479. A court treats direct and circumstantial evidence equally: circumstantial evidence can be as probative as direct evidence, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13).

## B. Applicable Law

To demonstrate possession of cocaine with intent to deliver, the State is required to show that: (1) appellant knowingly (2) possessed (3) cocaine (4) in an

6

amount greater than four but less than two hundred grams (5) with the intent to deliver. TEX. HEALTH & SAFETY CODE ANN. § 481.112(a), (d). In order to prove unlawful possession, the State must present evidence that: (1) the accused exercised control, management, custody, or care over the substance; and (2) the accused knew the matter possessed was contraband. *Id.* § 481.002(38); *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005).

Possession need not be exclusive. *Wiley v. State*, 388 S.W.3d 807, 813 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). "When the accused is not in exclusive possession of the place where the contraband is found, then additional, independent facts and circumstances must link the defendant to the contraband in such a way that it can reasonably be concluded that [the defendant] had knowledge of the contraband and exercised control over it." *Kibble v. State*, 340 S.W.3d 14, 18 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see also Roberts v. State*, 321 S.W.3d 545, 549 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). The evidence, whether direct or circumstantial, "must establish, to the requisite level of confidence, that the accused's connection with the drug[s] was more than just fortuitous." *Poindexter*, 153 S.W.3d at 405–06 (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)). "This rule simply [states] the common-sense notion that a person—such as a father, son, spouse, roommate, or friend—may jointly possess property like a house but not necessarily jointly possess the

7

contraband found in that house." *Id.* at 406. The accused's presence at the scene where contraband is found is insufficient, by itself, to establish possession. *Roberts*, 321 S.W.3d at 549 (citing *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006)). However, when combined with other direct or circumstantial evidence, presence or proximity may be sufficient to establish the elements of possession beyond a reasonable doubt. *Id.* Additionally, when narcotics are secreted, the State must address whether the accused knew of the existence of the secret place and its contents. *Id.* (citing *Medina v. State*, 242 S.W.3d 573, 576 (Tex. App.—Waco 2007, no pet.)).

Links that may establish knowing possession include: (1) the defendant's presence when a search is conducted; (2) whether the substance was in plain view; (3) the defendant's proximity to and the accessibility of the substance; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the substance was found; (12) whether the place where the substance was found was enclosed; (13) whether the defendant was found with a

large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Evans*, 202 S.W.3d at 162, n.12. The "number of . . . links proven is not as important as the logical force that they collectively create." *Wiley*, 388 S.W.3d at 814 (quoting *Hubert v. State*, 312 S.W.3d 687, 691 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd)). "The absence of various affirmative links does not constitute evidence of innocence to be weighed against the affirmative links present." *Id.* (quoting *James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd)).

**C.    Analysis**

Here, the evidence establishes several factors that link Henry to the cocaine found in station five. First, Henry was present at the scene when DEA and HPD officers arrived. Henry argues he "was not even on the premises at all when the search warrant was executed" because he was not physically inside the barbershop at the time. However, the evidence shows that he was sitting in his parked vehicle directly in front of the barbershop when the first police officers arrived on the scene to conduct surveillance, and remained there for approximately fifteen minutes before the rest of the police officers arrived to execute the warrant.

Next, Henry owned and had the right to possess the place where the cocaine was found. Although Henry was not in exclusive possession of the barbershop—there were four people inside at the time the police officers executed the search

9

warrant—he was the owner of the barbershop. And, Henry's barber's license and a personal photograph were on display at station five, where the cocaine was found. Henry points to the fact that his barber's license expired in 2009 as evidence that he did not have control over station five. However, the jury could have reasonably concluded that station five was Henry's workspace because the only personal effects found at station five, even if outdated, belonged to Henry.

Finally, when he was arrested, Henry was in possession of other contraband and a large amount of cash. After searching Henry's vehicle, police officers found marijuana, codeine, and a handgun. They also discovered $1,700 in Henry's car and $7,000 in his pocket. Furthermore, Officer Maxwell testified that after he hid the two stacks of money found in Henry's possession, his dog Rex alerted to the odor of narcotics in both areas where the two stacks of money were hidden.

We conclude that this evidence establishes sufficient facts linking Henry to the cocaine found at station five, thus showing Henry's knowledge of and control over the contraband. *See Poindexter*, 153 S.W.3d at 405. Viewing the evidence in a light most favorable to the verdict, a rational jury could have concluded that Henry exercised actual care, custody, control, or management over the 52.9 grams of cocaine found at station five in the Goodfellaz Master Barber Shop. *See Wiley*, 388 S.W.3d at 814–15 (holding evidence sufficient where cocaine was found in plain view in car registered to appellant and parked on public street in area known

10

for narcotics activity; paperwork found in car indicated it was owned by appellant; appellant was found with more than $2,000 cash when he was stopped by police; and appellant made furtive gestures when police officers approached him); *Roberts*, 321 S.W3d at 549–50 (holding evidence sufficient where appellant was in sole control of vehicle when it was stopped by police; appellant's wife testified that she and appellant owned vehicle together; appellant told police officer he would take possession charge when cocaine was found in jacket belonging to wife; and appellant was carrying large amount of cash when arrested); *Evans*, 202 S.W.3d at 166 (holding evidence was sufficient to support jury's finding that appellant knowingly possessed cocaine where evidence showed appellant was present and alone in house where drugs were found; he was sitting on couch and drugs were in plain view on table in front of him when police entered; he immediately knew why police were at house; he received mail at that house; and he was found with $160 cash in his pockets, even though he was apparently unemployed). We hold that there was sufficient evidence to support Henry's conviction.[1]

---

[1] Henry does not expressly challenge the sufficiency of the evidence of his intent to deliver. To the extent that his arguments on appeal can be construed as challenges to both the knowing possession of the cocaine and the intent to deliver elements of his conviction, we note that the intent to deliver can be determined by looking at a variety of factors, including the quantity of drugs the defendant possessed; the manner of packaging of the drugs; and whether the defendant possessed a large amount of cash in addition to the drugs. *See Kibble*, 340 S.W.3d at 18–19. Here, Officer Bryant testified that, when the police officers conducted a search of station five, they discovered a Styrofoam cup in the cabinet, which contained a crack cocaine cookie, crack rocks, powder cocaine, and two twenty-dollar bills. Officer

We overrule Henry's first and second points of error.

## Denial of Motion to Suppress

In his third point of error, Henry argues that the trial court erred by denying his motion to suppress the evidence obtained by a "sniff test" conducted by a drug-detection dog. Relying on two recent Florida Supreme Court cases, which have since been reviewed and decided by the United States Supreme Court, Henry contends that the sniff test conducted by the drug dog was an illegal and unlawful search and, therefore, the contraband discovered as a result of this search should have been suppressed. *See Florida v. Harris*, 568 U.S. ___, 133 S. Ct. 1050 (2013); *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409 (2013). We conclude neither case supports Henry's contention on appeal.

In *Harris*, the Supreme Court considered "how a court should determine if the 'alert' of a drug-detection dog during a traffic stop provides probable cause to search a vehicle" without a warrant. *Harris*, 568 U.S. at ___, 133 S. Ct. at 1053. After Harris challenged the reliability of the drug-detection dog, the Florida Supreme Court held that the officer in that case lacked probable cause to search

---

Maxwell testified that the amount of cocaine found in the Styrofoam cup in station five, 52.9 grams, was a larger amount than would be typical for personal use. He further testified that the fact that the crack rocks and powder cocaine were separated into individual bags and the crack cookie was whole rather than broken up into smaller pieces indicated that the drugs were for sale and not for personal use. Finally, Henry was arrested with $7,000 on his person and $1,700 in his vehicle. We conclude that the evidence was sufficient to establish that he knowingly possessed the cocaine found at station five with the intent to deliver.

12

Harris's vehicle because "the fact that the dog has been trained and certified is simply not enough to establish probable cause." *Id.* at ___, 133 S. Ct. at 1055 (citing *Harris v. State*, 71 So. 3d 756, 767 (Fla. 2011)). The Florida Supreme Court held that the State was required to produce a wider array of evidence, such as "an exhaustive set of records, including a log of the dog's performance in the field, to establish the dog's reliability." *Id.* at ___, 133 S. Ct. at 1053 (citing *Harris*, 71 So. 3d at 775).

The Supreme Court disagreed and reversed, holding that this standard was inconsistent with the "flexible, common-sense standard" of probable cause. *Id.* The Court explained that the better measure of a dog's reliability comes from controlled testing environments and, therefore, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert . . . [and] provides probable cause to search." *Id.* at ___, 133 S. Ct. at 1057. The Court concluded that a probable-cause hearing considering the reliability of the dog's alert should proceed like any other:

> If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe, as the Florida Supreme Court did, an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably

prudent person think that a search would reveal contraband or evidence of a crime.

*Id.* at \_\_\_, 133 S. Ct. at 1058. Therefore, because training records established the drug-detection dog's reliability in detecting drugs and Harris failed to undermine that showing, the Court determined that the officer had probable cause to search Harris's truck. *Id.* at \_\_\_, 133 S. Ct. at 1059.

In *Jardines*, the Supreme Court considered "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." *Jardines*, 569 U.S. at \_\_\_, 133 S. Ct. at 1412. After police officers received a tip that marijuana was being grown in Jardines's home, they set up a surveillance team to watch it. *Id.* When police officers realized Jardines was not home, Detective Bartlet, a trained canine handler, arrived on scene with his drug-sniffing dog and approached Jardines's front porch. *Id.* His dog began energetically exploring the front porch and, "[a]fter sniffing the base of the front door, the dog sat, which is the trained behavior upon discovering the odor's strongest point." *Id.* Based on this positive alert for narcotics, police officers sought and obtained a search warrant for the residence. *Id.* The Florida Supreme Court held that "the use of the trained narcotics dog to investigate Jardines' home was a Fourth Amendment search unsupported by probable cause, rendering invalid the warrant based upon information gathered in that search." *Id.* The Supreme Court affirmed, holding that the government's use

of trained police dogs to investigate the home and its immediate surroundings was an unlicensed physical intrusion that amounted to a search within the meaning of the Fourth Amendment. *Id.* at ___, 133 S. Ct. at 1417–18.

We find both *Harris* and *Jardines* inapplicable to the instant case. Henry's argument that these cases are controlling overlooks one important fact; here, the search was conducted pursuant to a search warrant, the validity of which Henry does not challenge. In *Harris* and *Jardines*, by contrast, officers used a drug-detection dog either to establish probable cause to search a vehicle without a warrant or to develop probable cause to obtain a warrant. Henry does not provide this court with citation to any authority, or any argument for that matter, to support the idea that the use of a drug-detection dog during the execution of a search warrant for narcotics is constitutionally unreasonable or unlawful.[2] Because the cases relied upon by Henry involve the reasonableness of the use of a drug-detection dog during a *warrantless* search, we conclude that he has failed to establish that the trial court erred by denying his motion to suppress based on the use of a drug-detection dog during a search for narcotics pursuant to a warrant.

Accordingly, we overrule Henry's third point of error.

---

[2] In fact, we note that this court previously has held that the presence of a drug-detection dog during the execution of a search warrant for counterfeit merchandise at an apparel store did not exceed the scope of the warrant and render the search illegal. *See Amir v. State*, No. 01-99-00640-CR, 2002 WL 58571, at *4–5 (Tex. App.—Houston [1st Dist.] Jan. 17, 2002, pet ref'd).

## Conclusion

We affirm the judgment of the trial court.

Rebeca Huddle
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

Publish.   TEX. R. APP. P. 47.2(b).