

NUMBER 13-14-00415-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

GENARO GALVAN ACOSTA JR.,                                  Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

### On appeal from the 156th District Court
### of Live Oak County, Texas.

# MEMORANDUM OPINION

### Before Justices Garza, Benavides and Perkes
### Memorandum Opinion by Justice Garza

Appellant, Genaro Galvan Acosta Jr., was convicted of possession of fifty pounds or less but more than five pounds of marihuana, a third-degree felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121(a), (b)(4) (West, Westlaw through Ch. 46, 2015 R.S.). After finding an enhancement paragraph true, the trial court sentenced him to twelve years' imprisonment. *See* TEX. PENAL CODE ANN. § 12.42(a) (West, Westlaw through Ch.

46, 2015 R.S.).  By a single issue on appeal, Acosta argues that the evidence adduced at trial was insufficient to support the conviction.  Because we agree, we reverse and render judgment of acquittal.

## I. BACKGROUND

Texas Department of Public Safety ("DPS") troopers Jose Prado and Raul Garcia stopped Acosta's vehicle for speeding on U.S. Highway 281 in Live Oak County on August 24, 2013.  Garcia stated that, about three months prior to the stop, he had seen Acosta driving the same vehicle in Live Oak County.  When Prado approached the vehicle, he observed that there were passengers inside not wearing seat belts.  Prado stated that Acosta was acting "nervous, just constant—continuous talking."  According to Prado, when Acosta stepped out of the car, he was "[e]xtremely nervous, jittery, shaking his hands, fishing for things in his pocket like loose change, doing some weird things with his hands to elaborate, scratching or messing with this area."[1]  Garcia also testified that Acosta appeared "nervous" and "fidgety," "couldn't control his speaking," and "could not look me straight in the eye and tell me there is nothing wrong with his car."  Acosta told Prado he was coming from Pharr and heading to Fort Worth to take one of the car's occupants, a child, "to go see his parents before the new school year started, and they had intentions of coming right back."  Prado testified that the car "stood out because most cars aren't that clean."  Additionally, the ignition key was not attached to any other keys, which the officers found unusual.

According to Prado's records, the car Acosta was driving was not registered to him, but rather to a "Ms. Guerrero out of Pharr."  Prado stated:  "[W]hen we asked Acosta

---

[1] The record does not reflect what "area" Prado was referring to in his testimony.

2

what relation he had with her it was inconsistent to what the wife told us."[2]   When the prosecutor asked Garcia whether "the answers were consistent or inconsistent about duration of stay, purpose, those sorts of things," Garcia replied:  "They were inconsistent." Both officers stated that drug traffickers often use vehicles belonging to a third party.

Acosta gave consent to search the vehicle.   The search revealed "religious artifacts" including a Bible and "good luck charms" depicting the "Santa Muerte," which, according to the officers, are commonly carried by drug traffickers.   The search also revealed "two plant-like items" or "herbs" which Prado stated are used for "good luck." Additionally, Acosta was in possession of around $300 in cash.

Using a tool which was found in a compartment in the rear of the car next to some of the "herbs," the officers removed a spare tire that was stored in a well underneath the floorboard.  Garcia stated that, as soon as the tire dropped from where it was secured, "it went to the right," indicating that it was "loaded with something that's not supposed to be there."  According to Prado, the spare tire was a different size than the tires which were actually mounted on the car, and the rim on the spare tire was made for a later model of car than the one Acosta was driving.  After cutting open the spare tire, the officers discovered seven "rectangular bundles" wrapped in "some type of clear paper."  The bundles were later confirmed to contain 24.48 pounds of marihuana.  Prado testified that he could not detect any odor of marihuana during the time it was "sealed in the tire."

Several photographs were identified by Prado and entered into evidence.  One photograph depicted "the lubricant of the oil that was used to prime the tire to get it back on there once they stuffed it with the narcotics or whatever . . . ."  According to Prado, it

---

[2] Neither officer testified as to what, exactly, Acosta and his wife told them about the registered owner of the vehicle.

3

was "still wet," which indicated that "it was recently done." Another photograph depicted "how clean the tire itself is." Prado testified: "Normally we have our spare tires under our cars. And you can wash your car all day, but how often do we go under there and clean the spare tire? We just don't do it. So to see one as clean as this is a big indicator." A third photograph depicted "tooling" on the bolt which had secured the spare tire in place; Prado stated that this indicated that the spare tire had "been recently lowered." Prado stated that it is not unusual for people who are carrying drugs to give consent to a search of their car.

Prado stated that, after discovering the contraband, he placed Acosta under arrest and read him his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Prado testified:

> We told him we found narcotics in the vehicle. He said, *You found drugs in the vehicle*, as if he was in shock or surprised. And then after we read him his rights he made the comment, and it's hard to interpret on the video, but it says, *I don't want my family to be here. If I take the fall will you let them go?* He said it in Spanish.
>
> And then right after he makes another statement saying that he didn't know about the drugs, why is his family here, *we didn't know about the drugs. Why are you holding us?*

Prado stated that the passengers in the car—Acosta's wife and two children, one of which was a minor—were handcuffed and detained briefly but were released at the scene. A video recording of the traffic stop from Acosta's patrol unit was entered into evidence without objection.[3]

On cross-examination, Prado conceded that he had been a DPS trooper for less than two months at the time of the events in question. He acknowledged that it is

---

[3] A certified court translator later testified, having reviewed the video recording of the traffic stop, that Acosta told the officers: "I'll give myself up if you don't arrest my family."

4

"ordinary" for a driver who has been stopped by police to become nervous. He agreed that it is "not unusual" for a person, when lending their car, to lend only the ignition key and not any other house keys. The officers never located or interviewed the car's registered owner, nor did they do any investigation of the case following Acosta's arrest. Prado conceded that Acosta has a disabled son, that Acosta may have received a disability check for his son, and that this might explain why Acosta had $300 in cash on his person. Prado agreed that Acosta was "very cooperative" during the traffic stop. Prado further acknowledged that the spare tire measured sixteen inches and the tires on the car measured seventeen inches; and he agreed that it is not unusual for a spare tire to be smaller than the tires on the car.

Prado agreed with defense counsel that Acosta was carrying an "invalid license" and had "a lot of outstanding tickets" at the time of the traffic stop. Prado further agreed that he could have arrested Acosta merely because of the "invalid license," and that this may explain why Acosta appeared nervous. He agreed that Acosta "never completely claimed responsibility or knowledge" of the marihuana in his vehicle.

On re-direct examination, Prado clarified that, prior to the search of Acosta's car, Acosta was given "written warnings for the traffic offenses" and Acosta then was permitted to drive his own vehicle to the sheriff's office, which is where the search took place. Prado stated:

> [B]efore we found the marihuana we could see [Acosta] from the parking lot [and] we saw him and his family pacing back and forth in the lobby, which is odd because if it was because of his license he had no reason to be scared or nervous at that point because he had already been issued the citation, meaning he wouldn't go to jail for that. And he got a warning for the seat belt and a citation for the speed. So he was—at that point for those traffic violations he was not going to jail for that.

Acosta was convicted and this appeal followed.

5

## II. STANDARD OF REVIEW AND APPLICABLE LAW

Acosta argues that the evidence was insufficient to show that he had knowledge of the marihuana which was found hidden in the spare tire of the car he was driving. In reviewing the sufficiency of evidence supporting a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When the record of historical facts supports conflicting inferences, we must presume that the trier of fact resolved any such conflicts in favor of the prosecution, and we must defer to that resolution. *Padilla v. State,* 326 S.W.3d 195, 200 (Tex. Crim. App. 2010).

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* A hypothetically correct jury charge in this case would state that Acosta is guilty if he knowingly or intentionally possessed a usable quantity of marihuana in an amount of fifty pounds or less but more than five pounds. *See* TEX.

6

HEALTH & SAFETY CODE ANN. § 481.121(a), (b)(4). A person acts intentionally with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. TEX. PENAL CODE ANN. § 6.03(a) (West, Westlaw through Ch. 46, 2015 R.S.). A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b). "Possession" means "actual care, custody, control, or management." TEX. HEALTH & SAFETY CODE ANN. § 481.002(38) (West, Westlaw through Ch. 46, 2015 R.S.).

To prove unlawful possession of a controlled substance, the State must prove that: (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005). However, when the accused is not in exclusive possession of the place where the substance is found, "it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband." *Id.* Under this rule, mere presence at the location where drugs are found is insufficient, by itself, to establish actual care, custody, or control. *Evans v. State*, 202 S.W.3d 158, 161–62 (Tex. Crim. App. 2006). But presence or proximity, when combined with other direct or circumstantial evidence of "affirmative links" between the accused and the contraband, "may well be sufficient to establish that element beyond a reasonable doubt." *Id.*

Some factors which may be considered in the "affirmative links" analysis include: (1) the accused's presence when a search is conducted; (2) whether the contraband was

7

in plain view or recovered from an enclosed area; (3) the accused's proximity to and the accessibility of the narcotic; (4) whether the accused was under the influence of narcotics when arrested; (5) whether the accused possessed other contraband or narcotics when arrested; (6) whether the accused made incriminating statements when arrested; (7) whether the accused attempted to flee; (8) whether the accused made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the accused owned or had the right to possess the place where the drugs were found; (12) whether the accused was found with a large amount of cash; (13) whether the conduct of the accused indicated a consciousness of guilt; (14) whether the accused had a special connection to the contraband; and (15) whether the accused was observed in a suspicious area under suspicious circumstances. *See id.* at 162 n.12; *Lassaint v. State*, 79 S.W.3d 736, 740–41 (Tex. App.—Corpus Christi 2002, no pet.).

It is "not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial." *Evans*, 202 S.W.3d at 162. "While affirmative links may be proved by circumstantial evidence, proof amounting to a strong suspicion or even a probability will not suffice." *Jenkins v. State*, 76 S.W.3d 709, 713 (Tex. App.— Corpus Christi 2002, pet. ref'd).

### III. DISCUSSION

The evidence at trial established conclusively that Acosta was driving the vehicle which contained the marihuana and that he was not the registered owner of the vehicle. Acosta argues that "[t]he fact that [he] was driving this vehicle does not automatically mean he owns the vehicle or any of its contents." That is true, but the fact that he was

8

driving the vehicle, combined with other evidence of "affirmative links," may potentially give rise to a reasonable inference that he knew what was inside the spare tire. *See Evans*, 202 S.W.3d at 161–62. The question is whether that other evidence establishes, "to the requisite level of confidence, that [his] connection with the drug was more than just fortuitous." *Poindexter*, 153 S.W.3d at 405–06.

Here, the officers testified to the following facts: (1) Acosta drove the same vehicle in Live Oak County about three months before the traffic stop at issue[4]; (2) he appeared nervous and "fidgety" and "couldn't control his speaking" during the traffic stop; (3) he could not look Garcia in the eye when Garcia asked if there was anything illegal in the car; (4) his statement regarding his relationship with the vehicle's registered owner, as well as his answers regarding the "duration of stay, purpose, those sorts of things," were inconsistent with the answers given by his wife; (5) the vehicle contained "religious artifacts" and "herbs" which are commonly carried by drug traffickers; (6) Acosta and his family were "pacing back and forth" in the lobby of the sheriff's office while the officers searched the car; and (7) after the contraband was found, Acosta asked the officers whether they would let his family go if he were to accept responsibility.

Applying these facts to the factors enumerated above, we observe that most of the factors are not present in this case. In particular, the evidence established that: (1) the marihuana was not in plain view; (2) it was not readily accessible to Acosta; (3) Acosta

---

[4] On appeal, Acosta states that his trial counsel "should have objected to this testimony" because the officer was "without any knowledge of the purpose of the previous trip, identification of Appellant as the same driver was never authenticated, and this testimony directly implied that Appellant made prior drug trafficking trips . . . ." However, Acosta does not argue, implicitly or explicitly, that his trial counsel afforded constitutionally ineffective assistance. In any event, in a sufficiency analysis we must consider all evidence actually admitted at trial, including erroneously admitted evidence. *See Moff v. State*, 131 S.W.3d 485 (Tex. Crim. App. 2004).

did not appear to be under the influence of drugs; (4) he did not possess other contraband or narcotics; (5) he did not attempt to flee; (6) he did not make furtive gestures; (7) there was no detectable odor of contraband; (8) there was no other contraband or paraphernalia present; (9) Acosta did not own the vehicle in which the contraband was found and there was no evidence that he had the right to possess the vehicle; (10) Acosta was not in possession of a large amount of cash[5]; and (11) he was not found in a suspicious area or under suspicious circumstances. *See Evans*, 202 S.W.3d at 162 n.12; *Lassaint*, 79 S.W.3d at 740–41. Nevertheless, the absence of various links does not constitute evidence of innocence to be weighed against the links present. *Hernandez v. State*, 538 S.W.2d 127, 131 (Tex. Crim. App. 1976); *James v. State*, 264 S.W.3d 215, 219 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

The only factors as to which the State presented evidence were: (1) that Acosta's "conduct indicated a consciousness of guilt"; (2) that he "made incriminating statements when arrested"; and (3) that he had a "special connection" to the contraband. *See Evans*, 202 S.W.3d at 162 n.12; *Lassaint*, 79 S.W.3d at 740–41. We will discuss each of these three factors in turn.

## A.    Conduct Indicating Consciousness of Guilt

We first address whether Acosta's conduct indicated a consciousness of guilt. We observed in *Lassaint v. State* that, while "[e]xcessive nervous behavior and unsettled

---

[5] Prado testified that Acosta was in possession of about $300 at the time of the traffic stop. However, he also testified that it would cost "well over [$]300" to pay for fuel for Acosta's round-trip journey. We do not believe $300 is so large an amount of cash as to be probative regarding whether Acosta knew of the contraband. *Cf., e.g., Henry v. State*, 409 S.W.3d 37, 43 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (finding $7,000 to be "a large amount of cash" in an affirmative links analysis); *Cisneros v. State*, 290 S.W.3d 457, 461 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (finding $2,243 to be "a large amount of cash" in an affirmative links analysis).

10

demeanor may be examples of consciousness of guilt," nervousness "is a tenuous link to the contraband because most people are somewhat nervous when confronted by a police officer." 79 S.W.3d at 743. Here, the officers testified that Acosta was nervous during the traffic stop, but that he answered their questions and was "very cooperative." Acosta's nervousness may be explained by the fact that he was just stopped by police with an invalid license, unbuckled passengers, and "a lot of outstanding tickets." Prado stated that, after Acosta had been cited for the invalid license and warned for the seat belt violation, "he had no reason to be scared or nervous" but was still "pacing back and forth in the lobby." But we do not believe that "pacing back and forth" in the lobby of a police station while waiting for one's car to be searched for contraband constitutes furtive or suspicious behavior.

Prado also testified that Acosta gave different answers to his questions than did Acosta's wife. But there was no evidence as to whether the answers given by Acosta were true. In *Lassaint*, we noted that "[t]he conflicting or untruthful statements of others cannot serve as an affirmative link when the accused made truthful statements." *Id.* at 745. Here, because there was no evidence as to whether Acosta's answers were truthful, the fact that his answers conflicted with his wife's answers cannot serve to affirmatively link him to the drugs. *See id.*

B. **Incriminating Statement**

Second, we address Acosta's allegedly incriminating statement. After the officers told Acosta they found drugs in the vehicle, Acosta said: "I don't want my family to be here. If I take the fall will you let them go?" His statement was alternately translated as: "I'll give myself up if you don't arrest my family." This statement was not a direct admission

11

of guilt—in fact, according to Prado, at around the same time as Acosta made the statement, Acosta acted "as if he was in shock or surprised" that the officers found drugs in the car, and he repeatedly denied knowing the drugs were there. Nevertheless, the fact that Acosta offered to take responsibility in exchange for the release of his family does weigh in favor of finding an affirmative link between him and the contraband.

## C.    Special Connection to Contraband

Finally, we consider whether the "religious artifacts" and "herbs" found in the vehicle may establish a "special connection" between Acosta and the contraband. *See Lassaint*, 79 S.W.3d at 741.[6]  Prado stated that he saw a "Bible on the dashboard" and "good luck charms inside [Acosta's] wife's purse." He stated that the "herbs" were found "on the sun visor and near the compartment where the tools to lower [the tire containing] the drugs were located." According to Prado, the "Santa Muerte" is "supposed to bring good luck and faith and guidance to people" and is "worshipped" by human smugglers and drug traffickers.

First, we note that neither officer testified that the "herbs" found in the vehicle are typically used by drug traffickers or are indicative of criminal activity. Instead, Prado opined that they are used for "good luck" and Garcia testified that they were "put there for a purpose" but did not elaborate on what that purpose was. The presence of the "herbs" in the vehicle, therefore, cannot affirmatively link Acosta to the contraband based on the evidence adduced at trial.

---

[6] We do not believe the officers' testimony regarding Acosta's keychain is probative as to a "special connection" between Acosta and the contraband. The officers testified that the key to the vehicle Acosta was driving was on a keychain with no other keys, and that this was unusual. However, there was no testimony that this was indicative of criminal activity. Moreover, the keychain—as depicted in the photograph entered into evidence—appears to have at least one other key attached to it.

12

We next address the "religious artifacts." Texas appellate courts have considered the significance of objects depicting Santa Muerte in other cases. In *Cantu v. State*, the court considered the fact that appellant carried a Santa Muerte statue as a factor in favor of finding that police had reasonable suspicion to detain the appellant. No. 04-13-00207-CR, 2014 WL 4230068, at *4 (Tex. App.—San Antonio Aug. 27, 2014, no pet.) (mem. op., not designated for publication) (noting that the testifying officer "learned in his criminal interdiction training that people involved in the drug trade sometimes carry such an item with them because they believe it will protect them and their drug loads"). In *Flores v. State*, the Fourteenth Court of Appeals noted that "Santa Muerte is known as the patron saint of narcotics traffickers" but did not explicitly consider the fact that appellant possessed a Santa Muerte medallion and shrine in concluding that the evidence supported "affirmative links." 440 S.W.3d 180, 186 (Tex. App.—Houston [14th Dist.] 2013), *vacated on other grounds*, 427 S.W.3d 399 (Tex. Crim. App. 2014). In *Batiste v. State*, the Texas Court of Criminal Appeals found that the trial court did not abuse its discretion by overruling the appellant's objection to punishment phase evidence of a Santa Muerte necklace that appellant was wearing when he was arrested. No. AP-76,600, 2013 WL 2424134, at *6 (Tex. Crim. App. June 5, 2013) (not designated for publication). There, the testifying officer explained that, "in the criminal world, it's worn . . . to keep the police away and hope your criminal endeavor goes okay." *Id.* at *4. The officer conceded, however, that "non-criminals" may "also have items that might have Santa Muerte on them" and that "[n]ot everybody wearing a Santa Muerte is a criminal." *Id.* at *4 n.5. The Court found that the testimony was relevant as to appellant's gang membership, which in turn was relevant to future dangerousness, and therefore the

evidence was admissible at the punishment phase. *Id.* at \*5. In *Mireles v. State*, the Dallas court found that it was not error to deny a mistrial when the State presented evidence at the punishment stage that the defendant worships Santa Muerte and that followers of Santa Muerte commit violent acts. No. 05-12-00040-CR, 2013 WL 226190, at \*11 (Tex. App.—Dallas Jan. 18, 2013, no pet.) (not designated for publication) (noting that the trial court instructed the jury to disregard the remark and appellant did not rebut the presumption that the jury followed the instruction). Finally, in *Medina v. State*, the First Court of Appeals found insufficient evidence to support "affirmative links" even though a bag containing crack cocaine was found on top of a Santa Muerte shrine in appellant's house. No. 01-10-01134-CR, 2011 WL 6013094, at \*5 (Tex. App.—Houston [1st Dist.] Dec. 1, 2011, pet. ref'd) (not designated for publication) (noting that "appellant was not present at her house when the drugs were found, and there was no evidence about how long she had been absent from the house"). The State has not directed us to any case, and we find none, where evidence of an object depicting the Santa Muerte has been explicitly held to establish an "affirmative link" between the owner of the object and the contraband.

Under the circumstances of this case, we find that the officers' testimony regarding the Santa Muerte, even viewed in the light most favorable to the prosecution, could not affirmatively link Acosta to the drugs. The rules of evidence provide that opinion testimony by lay witnesses must be "rationally based on the witness's perception," *see* TEX. R. EVID. 701(a), but the officers did not testify as to any perceptions which undergirded their opinion that the presence of Santa Muerte is indicative of criminal activity. Although defense counsel did not object to this testimony, conclusory statements are generally not

14

probative evidence. *See Swearingen v. State*, 303 S.W.3d 728, 733 (Tex. Crim. App. 2010) (holding that a witness's "conclusory statement" that "individuals deposit their DNA on objects that they touch" was not "concrete evidence that biological material existed on the evidence sought to be tested"). Moreover, even if Acosta's testimony regarding the tendencies of drug traffickers may generally be considered probative, there was no evidence, direct or circumstantial, that Acosta was aware that the Santa Muerte "good luck charms" were in his wife's purse.

**D.    Analysis**

The only probative evidence that we find in the record tending to establish an affirmative link between Acosta and the contraband are the undisputed facts that: (1) he was found in the same car as the contraband, and (2) he offered to accept responsibility if the officers would let his family go. There was no direct evidence establishing Acosta's knowledge of the contraband in his vehicle—for example, there were no fingerprints collected from the bundles, the spare tire, or the tool used to access the tire—and there was no direct or circumstantial evidence establishing that Acosta was present when the drugs were loaded in the car. Moreover, police did not interview or even investigate the identity of the registered owner of the vehicle. And, it is undisputed that, although Acosta appeared nervous during the traffic stop, he answered the officers' questions and cooperated with them fully.

We believe this case is analogous to *Jenkins v. State*, in which we held there was insufficient evidence of intentional or knowing possession of drugs. *See* 76 S.W.3d at 719. There, an officer observed a car crossing a lane marker and initiated a traffic stop. *Id.* at 714. Jenkins, who was in the front passenger's seat, began "moving around,

15

shuffling inside the car" and another passenger in the back seat "popped up." *Id.* The driver exited the vehicle immediately, which the officer found to be uncommon, and gave information regarding his criminal history which differed from police records. *Id.* Jenkins, meanwhile, appeared "more nervous than normal" and, when the officer asked him to exit the vehicle, he "backed toward [the officer] as if to be handcuffed," which the officer found unusual. *Id.* Jenkins gave "unsure and evasive" answers to the officer's questions. *Id.* The back seat passenger, who was the owner of the car, consented to a search, which revealed a loaded handgun underneath the front passenger seat. *Id.* After the officer opened the trunk, he "recognized the odor of marihuana" and discovered seven bundles of marihuana. *Id.* at 715. Later, the back seat of the car was removed, revealing "an envelope, a box of sandwich baggies, rubber gloves, $1,978 in cash," and a box containing cocaine. *Id.* A black duffel bag belonging to the driver, which was found in the back passenger seat, contained "baggies used for weighing and packaging drugs." *Id.*

We held that all of this evidence was insufficient to "link appellant to the contraband in such a manner and to such an extent that a reasonable inference may arise that the accused knew of the contraband's existence and that he exercised control over it." *Id.* at 719. We held that Jenkins's movements in the car were not furtive because there was "nothing suspicious" about the surrounding circumstances. *Id.* at 718 (noting that "[m]ere movement by an occupant in a vehicle being stopped by a law enforcement officer, not coupled with reliable information nor suspicious circumstances, does not give rise to probable cause to search of the vehicle"). We acknowledged that there was a large amount of cash in the car, but because two other people "had personal property

16

connected either with drug paraphernalia or the marihuana"—i.e., the driver and back seat passenger—the probative force of this evidence was "decrease[d]." *Id.* Further, the officer's testimony that "those who transported large amounts of drugs tended to travel with weapons" did not link Jenkins to the contraband because the officer "conceded that it was possible for a person sitting in the front passenger seat to not know a firearm was underneath," and there were no fingerprints linking Jenkins to the gun. *Id.* Finally, although there were three pairs of shoes found in the trunk where the marihuana was found, there was no evidence of Jenkins's shoe size or that the shoes belonged to him, "much less that [he] placed them there at a time when the marihuana was present." *Id.*

Here, as in *Jenkins*, there were multiple adults other than the appellant in the car when the contraband was found, and the State offered minimal evidence tending to establish that the appellant was more responsible than the other occupants for the presence of the contraband. We therefore find that, based on all of the evidence adduced at trial, a reasonable trier of fact could not have concluded beyond a reasonable doubt that Acosta's possession of the marihuana was "more than just fortuitous." *See Poindexter*, 153 S.W.3d at 405–06. Instead, even when viewed in the light most favorable to the verdict, the evidence supported no more than a mere suspicion—or at most, a bare probability—that Acosta had "actual care, custody, control, or management" of the marihuana found in the vehicle he was driving. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.002(38); *Jenkins*, 76 S.W.3d at 713. Accordingly, the evidence was insufficient to support the conviction, and we sustain Acosta's issue on appeal.

## IV. Conclusion

We reverse the trial court's judgment and render judgment of acquittal.

DORI CONTRERAS GARZA,
Justice

Dissenting Opinion by
Justice Gregory T. Perkes

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of July, 2015.

18