DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CID TORREZ,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D18-1277

[April 22, 2020]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Lisa M. Porter, Judge; L.T. Case Nos. 12-17185CF10A, 14-010607CF10A.

Carey Haughwout, Public Defender, and Tatjana Ostapoff, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Rachel Kaiman, Assistant Attorney General, West Palm Beach, for appellee.

KLINGENSMITH, J.

Cid Lenin Torrez appeals his conviction and sentence for second-degree murder. He raises four issues on appeal, but only two merit discussion: (1) whether the trial court erred in admitting the cadaver dog evidence; and (2) whether the trial court erred in failing to make an independent finding of Torrez's competency to be sentenced.

## I.    Facts

Torrez was married to the victim, his wife Vilet Patricia Torrez ("Vilet"). In September 2011, Torrez moved out of the family home after a domestic incident in which he was violent towards Vilet. Although Torrez and Vilet were still married, they lived separately from that time on; Vilet stayed in the family home with the children and Torrez moved to an apartment.

Surveillance from a security camera showed Vilet in her vehicle entering the gate of her neighborhood in the early morning hours on the day of her disappearance. A neighbor's video surveillance camera also

confirmed that Vilet's vehicle was on the street at that time. This was the last time that Vilet was seen or heard from. Records of Vilet's cell phone showed that her last phone calls were made at the same time that morning to Torrez's cellphone. Days later, Torrez called 911 to report Vilet missing. Law enforcement determined that Vilet neither conducted any financial activity, nor travelled after that date. Crime scene technicians found numerous blood stains on the staircase, the wall next to the staircase, and the light switch in the children's bedroom inside Vilet's home. The DNA profiles obtained from the sampled blood from the residence had a mixture of two individuals: Vilet and Torrez.

Because of the presence of blood stains in the home, and the suspicion they were dealing with a possible homicide, authorities decided to use a human remains detection dog or cadaver dog in their search. The detection dog named Canine Jewel, handled by Officer Gregory Strickland of the City of Miramar Police Department, was solely and extensively trained and certified to recognize the odor of human remains. The dog alerted several times to a grassy area by the home's front door and showed behavior consistent with detecting the odor of human remains.

The investigation into Vilet's disappearance proceeded over several months. Almost five months after their initial canvas of the suspected crime scene and surrounding area, Officer Strickland and Jewel were asked to help again. This time they deployed in the rear parking lot of a police station where there were several vehicles, including one owned by Torrez. Officer Strickland slightly opened the doors and trunks of the vehicles and Jewel again showed a behavioral change next to the rear door of Torrez's car consistent with an alert to the odor of human remains. When Jewel came to the car's trunk, she nudged it open further and jumped inside. Jewel sniffed between the floor of the trunk and the back seat and went into her trained final response, which tells the handler that she was as close as possible to the trained odor of human remains. Jewel also gave a trained final response to the odor of human remains in the backseat of the car.

Officer Strickland removed the carpet that covered the spare tire and tire jack inside the trunk. After he did, Jewel again jumped into the trunk, put her nose down in the wheel well where the spare tire would be, and gave an immediate trained final response as an alert to the odor of human remains.

Another search was done by Detective Juliana Martinez who worked as a full-time detective and part-time canine handler with the Palm Beach County Sheriff's Office ("PBCSO"). Det. Martinez and Canine Piper

2

assisted with a search of Torrez's vehicle independently of the search that Officer Strickland and Jewel performed. Piper also alerted, or exhibited a change in behavior, to the outside rear door of the vehicle and came to a final response at the seam of the rear door. Piper exhibited the same change in behavior at the trunk and gave another final response when she sniffed the seam of the trunk.

To this date, Vilet's body has not been located. However, the abovementioned evidence, in conjunction with other evidence adduced during the investigation, led authorities to charge Torrez for the alleged murder of his wife.

*A. Cadaver dog evidence.*

Before trial, Torrez moved to exclude any testimony of, and any evidence related to, the dogs and their handlers. He claimed the evidence did not meet the standard for admissibility of scientific evidence. The court held an evidentiary hearing and heard testimony from several witnesses.

1. Officer Gregory Strickland

Officer Strickland testified at the pretrial hearing regarding his qualifications as well as the training, certification and reliability of Jewel. He testified that he was a detective with the Miramar Police Department and had been a canine handler for the City of Miramar since 2006. At the end of 2006 or beginning of 2007 he was assigned canine "Jewel." Jewel came from California Task Force 6. She began her training with the Federal Emergency Management Association ("FEMA") and was shipped to Florida and issued to him. Jewel's target odor was human remains. He and Jewel went through a canine search specialist course which consisted of 400-500 hours of extensive training. They continued this regimen as in-the-field training and weekly-maintenance training. They were certified in 2007 in human remains detection after approximately a year of training. He conducted weekly-maintenance training with Jewel at a minimum of sixteen hours per month and applied for recertification once a year. Jewel was certified by the North American Police Working Dog Association ("NAPWDA") from 2007 through 2012. She always obtained certification. Officer Strickland recalled only one incident throughout this time when Jewel gave the final response in the absence of any human remains. This occurred when she was deployed in Texas after Hurricane Ike in December 2008 to identify human remains. Jewel gave a final response to an area of debris and after a search of that area was conducted the only thing located was a bucket of shrimp. However, human remains were recovered near that area several days later. Nevertheless, Officer Strickland

attributed this initial false positive alert to the long and tedious hours they had been working and that Jewel wanted to play a little bit. Because of this response Jewel was remediated immediately and she would no longer show a trained final response to the odor of shrimp. There had been no other issues with Jewel since December of 2008. The training records for Jewel for 2012 were received in evidence as were Jewel's certifications from 2007 to 2012, and certifications from the NAPWDA. Those certifications required that Jewel find at least eleven of twelve "hides," which is approximately a ninety-one percent accuracy rate. Jewel has alerted to full decomposed bodies and has also alerted to skeletal remains. The longest period Officer Strickland was aware of Jewel alerting to the odor of human remains after the remains were removed was a week.

### 2. Detective Juliana Martinez

The court also heard testimony from Det. Martinez of the PBCSO. Det. Martinez testified she was a detective and part-time canine handler assigned to Canine Piper for nine years. The PBCSO purchased Piper, a black Labrador, from a company in California where she had been imprinted on the odor of human remains. Det. Martinez flew to California and attended a two-week handler course with Piper and then came back to Florida and attended a four-month academy with the PBCSO. After the academy, Piper was certified in detecting the scent of human remains. Piper was trained at least twice a month. Piper's 2009, 2010, 2011, and 2012 training records and certifications were received in evidence. Det. Martinez testified that in the nine years she had Piper, Piper never failed to be certified. Det. Martinez also testified about how the Miramar Police Department contacted her to assist in a search of a parking lot behind the Miramar substation in August 2012. Det. Martinez described that when Piper detects the odor of human remains, she snaps her head, sometimes closes her mouth, sniffs certain areas, slows down and then sits as a final response.

### 3. Trainer Nick Barbera

The court also heard testimony from Nick Barbera, a trainer and handler for the PBCSO canine unit. He has been a handler for twenty years and a trainer for almost fifteen years. The PBCSO has forty-eight canines, two of which are human remains detection dogs. Barbera trains with Det. Martinez and Piper at least twice a month. He testified that in his experience, Piper is a reliable human remains detection dog. Barbera described the training he did with Piper, using human blood, tissue, placenta, bone and teeth. The PBCSO trains with their dogs outdoors eighty to ninety percent of the time. Like Det. Martinez, Barbera also

described how Piper responds when she detects the odor of human remains. He stated that Piper snaps her head, slows down, and has respiratory changes. Barbera had seen Piper change behavior in response to animal odors but said that she would not alert and might only show interest.

### 4. Dr. Kenneth Furton

The trial court also heard testimony from Dr. Kenneth Furton, a professor of chemistry and biochemistry at Florida International University. He is also the Provost, Executive Vice President and Chief Operating Officer at the university. He has been a professor since 1988. His curriculum vitae was received in evidence. Dr. Furton has studied the chemicals that dogs use to locate forensic specimens for over twenty years. He has over thirty publications related to dog's detection of odors. He has worked with dogs used for human remains detection for the past ten years. He has published papers discussing the specific chemicals given off by human remains. His most recent publication examined the volatile organic compounds (VOCs) given off by deceased human subjects. During his testimony, he described the testing methods he uses to detect these compounds by using gauze material to collect the scent from the human remains and then analyze it in the laboratory to identify the VOCs in the sample. He then tests the dogs to those chemicals in the field to help develop training aids that are safe to use.

Dr. Furton reviewed the specifics of this case in terms of the scent-detection searches by Det. Martinez and Officer Strickland and reviewed the training and certification records for the officers and their canines. He expressed his opinion that the certifications of the canines are the most important measure of the reliability of the detection team because testing is done in a controlled setting with an outside observer. The training records are important to show the regular maintenance of the team. Dr. Furton recalled that he has testified as an expert approximately thirty times, mostly related to narcotics detection dogs. He has testified as an expert for the defense in only one previous case involving canine human remains detection. In his opinion, canine Piper and Det. Martinez were a reliable team because they had multiple certifications including the NAPWDA, which as stated above requires a reliability rating of approximately ninety-one percent. It was also his opinion that canine Jewel and Officer Strickland were a reliable detection team, based on their regular maintenance and annual certifications. Regarding how long a scent can be detected, it was his opinion that, depending on the concentration of the odor, the odor can remain for a very long period, especially in an enclosed area. Even if the area is opened, dogs can still

alert at very low threshold areas, even at levels below detection by instruments. Additionally, Dr. Furton testified that the fact the two dogs in this case alerted independently of each other increased the reliability of the alert.

To Dr. Furton, the fact that a body was not discovered in the trunk did not invalidate the alerts. Dr. Furton stated that there were three explanations for an alert, or an otherwise non-productive response, in the absence of a discovery of remains. First, in a controlled setting where there is no target, it can be called a false positive. Second, the material causing the alert may be inaccessible. For example, in the case of a vehicle's trunk, the material or odor could have permeated into a crack or seam such that it could not be reached. Additionally, if fluids from a body go through carpet or down below in a trunk, the odor can permeate into rubber seals or other materials that are part of the vehicle. In these situations, it is possible to have an odor but no DNA recovery. Third, there could be residual odor, which is odor remaining after the target is removed. As indicated by his first explanation, Dr. Furton acknowledged that with dogs, like humans, there is a possibility of errors.

Following this evidentiary hearing, the trial court issued a written order denying Torrez's motion to bar evidence of the cadaver dog searches and alerts under both *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In its order, the court noted, however, that there were no cases in Florida dealing with the admissibility of cadaver dog evidence to guide its decision.

*Daubert analysis*

In considering the admissibility of cadaver dog evidence under the *Daubert* standard, the trial court's analysis began with an examination of the Florida Evidence Code:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
> (2) The testimony is the product of reliable principles and methods; and
> (3) The witness has applied the principles and methods reliably to the facts of the case.

6

§ 90.702, Fla. Stat. (2017); *accord Daubert*, 509 U.S. at 579.

As to the first prong under section 90.702, the court found that the testimony of the dog handlers was based upon sufficient facts or data. Officer Strickland, who worked with canine Jewel for over six years, was trained in Jewel's alert behavior and maintained her records and certifications. Jewel was off-lead when she independently alerted to the trunk of Torrez's car. Det. Martinez was also trained in Piper's behavior, maintained Piper's records, and trained with her every month. Piper similarly alerted, off-lead and independent of Jewel, to the trunk of Torrez's car. Neither of the handlers or their canines were aware of the facts of this case at the time they participated in the searches.

As to the second prong, the court found that the subject testimony was the product of reliable principles and methods. The court considered the case of *People v. Lane*, 862 N.W.2d 446, 457-58 (Mich. App. Ct. 2014), a Michigan decision that applied *Daubert* to conclude that cadaver dog evidence was sufficiently reliable and therefore admissible. The *Lane* court articulated the following four-part test that the proponent of cadaver dog evidence needed to meet: (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in identifying human remains; (3) circumstantial evidence corroborates the dog's identification; and (4) the evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it. *See Lane*, 862 N.W.2d at 457. Applying the *Lane* four-part test for reliability, the trial court made the following findings:

(1) The handlers were qualified to use the dogs.

Officer Strickland and Det. Martinez were both qualified to handle their dogs. Officer Strickland worked as a canine handler since 2006, approximately six years before working on this case, and had worked as a FEMA search and rescue canine handler. He began working with Jewel in 2006 or 2007. Officer Strickland completed 400-500 hours of a Canine Search Specialist equivalence course with FEMA. He continued with in-the-field training weekly and maintenance training with Jewel until she was certified in 2007. He trained for a minimum of sixteen hours a month and received yearly recertification as a canine team with Jewel. Officer Strickland was also certified by three separate organizations from 2007 to 2012 as a canine handler with Jewel.

Det. Martinez testified that she had worked as a canine handler with Piper for nine years. She initially completed a two-week handler course

with Piper in California, and afterwards went through a four-month academy with another trainer at the PBCSO.

(2) The dogs were trained and accurate in identifying human remains.

Both Jewel and Piper are certified solely on the detection of human remains through the NAPWDA. Jewel was trained to detecting anything from fully decomposed bodies up to skeletal remains. NAPWDA standards require, according to Dr. Furton, rigorous testing where the dogs must achieve approximately ninety-one percent reliability in controlled testing to become certified. Based upon Dr. Furton's knowledge and experience, he found the Officer Strickland/Jewel team and the Det. Martinez/Piper team to be reliable for human remains detection. Det. Martinez and Piper were certified multiple times as a team and had regular maintenance training. Both canines periodically tested under controlled conditions and maintained their certifications. Both Officer Strickland and Det. Martinez testified that they were able to read their canines' behavior as a result of their extensive training. Each dog had a different alert which their handlers were trained to recognize.

Officer Strickland testified that during his entire time working with Jewel there was one incident, on a deployment to Texas in 2008 after Hurricane Ike, in which she responded to something that was not human remains: spoiled shrimp. That behavior was remediated, and she has not had any trouble since.

Det. Martinez testified that Piper was deployed once or twice a month. Det. Martinez trained with her at least twice a month. In nine years, Piper never hit on anything that was not human remains. Both Det. Martinez and Piper have also trained with FEMA.

(3) Circumstantial evidence corroborated the dog's identification.

The court found that there was enough circumstantial evidence to corroborate the dogs' alerts. The trial court also noted that although Vilet had not been found, there was ample evidence suggesting that she was dead, including that: Vilet was last seen alive on March 31, 2012; she had not contacted family or friends since that date; she had not accessed her credit cards or savings account; and she left several personal belongings behind.

The State also proffered the following circumstantial evidence which further suggested that Vilet was deceased and that Torrez was the culprit:

- Torrez was involved in a prior domestic battery incident where Vilet reported that he had choked her. The two separated after this incident and Torrez no longer had access to the family home, yet a few days prior to Vilet's disappearance his access was reinstated.
- Torrez was jealous and upset that Vilet was dating a coworker, and placed spy software on her phone. Vilet had been with this coworker the night before her disappearance.
- Torrez and Vilet's daughter heard screaming "overlapping" with Torrez's voice from another room in the house on the day of Vilet's disappearance.
- Torrez previously stated that "[i]f [Vilet's] not with me, she will be dead." He also questioned a friend about the best way to get rid of a body.
- Torrez's whereabouts were unknown for most of March 31 and April 1.
- On April 2, after Vilet had not been seen for two days, Torrez called 911 – but only after he was encouraged to do so by his daughter and a friend.
- Evidence obtained from Vilet's residence was consistent with Torrez backing his car up to the house in such a way that he could move Vilet's body into his trunk or elsewhere inside his car.

(4) The evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it.

The court considered evidence that Vilet was last seen in the early morning hours of March 31. The initial alert to the front of Vilet's residence by canine Jewel, who was off-lead, was on April 2.

The second alert by Jewel was four-and-a-half months later in an impound yard. Officer Strickland testified that he had no independent knowledge about any details of the investigation before the search. Jewel was again off-lead and became animated near the passenger side of a white Jaguar. She then alerted to the Jaguar's trunk and gave a trained, sitting response. The trunk lid was ajar. Officer Strickland later learned that this was Torrez's vehicle, but did not know this at the time.

Det. Martinez, who worked independently of Officer Strickland, testified that Piper came to a final response both outside the Jaguar and inside the vehicle by the backseat and trunk. When the car was first searched, the doors and trunk were closed and, when the trunk was opened, she sat in the trunk. This was her final response. There was no evidence that the

scent in the vehicle was contaminated in the months between Vilet's disappearance and the two dogs' encounter with it.

Based upon the testimonies of the handlers as well as Dr. Furton, the court did not find that the evidence was so stale or contaminated to make it beyond the dogs' competency to identify.

As to the third and final prong under the statute, the trial court found that the canine handlers applied the methods and principles reliably to the facts of the case. The dogs were shown to be reliable in the past through testing, training, and certification. Having heard the testimony of canine trainer Barbera, the two handlers, and Dr. Furton, as well as having reviewed the training records submitted into evidence, the court found the methods and principles used in this case to be reliable.

*B. Trial*

All the witnesses who testified at the evidentiary hearing also testified at trial and provided essentially the same information as they did pretrial. When the canine evidence was admitted during trial, the court granted defense counsel's request to give a specialized jury instruction relating to this evidence as well as in the final jury charge.

The jury found Torrez guilty of second-degree murder as a lesser included offense of first-degree murder, three charged counts of unlawful interception of electronic communications, and one charged count of unlawful use of intercepted communications.

*C. Sentencing*

During Torrez's initial sentencing hearing, he requested to speak to President Trump and stated: "Commander-in-chief, the witch hunt ends here. Please come and talk to me." Torrez also wanted to speak to "the First Lady," and "a monster" called "the Madi Arella." Based on these and other statements Torrez made during his sentencing hearing, defense counsel moved for a competency determination pursuant to Florida Rule of Criminal Procedure 3.210(b) and requested that sentencing be adjourned so that Torrez could be examined by a medical expert. The trial court obliged and took a brief recess to give a mental health professional the opportunity to examine Torrez. After performing two exams the medical expert opined that Torrez suffered from mental issues and appeared delusional at times but was nonetheless competent to be sentenced. The court reset sentencing to provide time to obtain and review a formal report from the expert.

After getting that report, the court resumed the process and conducted a sentencing hearing whereupon the trial court imposed a sentence of life imprisonment on the second-degree murder charge, as well as five years' imprisonment for each of the four electronic communications charges. However, the court never made an independent finding on the record that Torrez was competent to proceed with sentencing and never entered a written order memorializing that finding.

This appeal followed.

## II.    Admissibility of the cadaver dog evidence.

On appeal, Torrez alleges that the trial court erred by admitting the cadaver dog evidence because it was not based on reliable scientific evidence or methods.  Torrez argues here, as he did before the trial court, that the science underlying cadaver dog evidence is not reliable, and thus the trial court erred in admitting testimony relating to this evidence.

We recognize, as did the trial judge, that the admission of cadaver dog evidence has not yet been considered by the Florida appellate courts.  For our review of the admissibility of cadaver dog evidence, we consider the trial court's application of *Daubert* to the facts of this case.  Because *Daubert* is procedural, the law applies retroactively to this case.  *See In re Amendments to Fla. Evidence Code*, 278 So. 3d 551, 554 (Fla. 2019); *Pembroke Lakes Mall Ltd. v. McGruder*, 137 So. 3d 418, 425 (Fla. 4th DCA 2014).  Additionally, "[u]nder Florida's 'pipeline rule,' the 'disposition of a case on appeal should be made in accord with the law in effect at the time of the appellate court's decision rather than the law in effect at the time the judgment appealed was rendered.'"  *Kemp v. State*, 280 So. 3d 81, 88 (Fla. 4th DCA 2019) (citation omitted); *see also Perez v. Bell S. Telecomms., Inc.*, 138 So. 3d 492, 494 (Fla. 3d DCA 2014) (applying *Daubert* retrospectively and concluding that affirmance was warranted under either *Frye*, the standard considered by the trial court, or *Daubert*, the standard applied on appeal).

"A trial court has wide discretion in determining the admissibility of evidence, and, absent an abuse of discretion, the trial court's ruling on evidentiary matters will not be overturned."  *Sajiun v. Hernandez*, 226 So. 3d 875, 877 (Fla. 4th DCA 2017) (quoting *Kellner v. David*, 140 So. 3d 1042, 1046 (Fla. 5th DCA 2014)).

A trial court is similarly vested with discretion "in determining how to perform its gatekeeper function when addressing the admissibility of

expert opinion testimony" under the *Daubert* standard. *Booker v. Sumter Cty. Sheriff's Office/N. Am. Risk Servs.*, 166 So. 3d 189, 192 (Fla. 1st DCA 2015). However, "that discretion is limited by the rules of evidence." *Michael v. State*, 884 So. 2d 83, 84 (Fla. 2d DCA 2004).

A. Admissibility under section 90.702

Section 90.702, Florida Statutes codifies the *Daubert* standard found in Federal Rule of Evidence 702 and governs the admissibility of expert testimony. *See Bunin v. Matrixx Initiatives, Inc.*, 197 So. 3d 1109, 1110 (Fla. 4th DCA 2016). In *Daubert*, the United States Supreme Court charged trial courts with assuming the role of gatekeeper and making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592–93. In short, *Daubert* provides that expert testimony is admissible if it is relevant and reliable. *See id.* at 589. The exception to the *Daubert* analysis is in cases involving evidence of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system. *See Booker*, 166 So. 3d at 194.

Torrez argues that under a *Daubert* analysis the science underlying the expert cadaver dog testimony was not sufficiently reliable to be admissible. A similar argument, regarding the reliability of dog scent-tracking evidence, was rejected by the First District in *Gear v. State*, 257 So. 3d 1243, 1245 (Fla. 1st DCA 2018). In *Gear*, the defendant argued that the State failed to lay a proper foundation for the admission of dog trailing evidence because there was no showing that such evidence was reliable. *Id.* at 1246. The First District rejected this contention and explained that other district courts have held dog tracking evidence to be admissible if a proper foundation is laid. *Id.* (citing *McCray v. State*, 915 So. 2d 239, 241 (Fla. 3d DCA 2005)). "The foundation requirement pertains to establishing the reliability of the dog, which may be accomplished by introducing evidence of the dog's breed, training, past performance, and other indicia of reliability." *Id.*; *accord Toler v. State*, 457 So. 2d 1115, 1117 (Fla. 1st DCA 1984); *see also Green v. State*, 641 So. 2d 391, 394 (Fla. 1994) (allowing evidence to be admitted where "the character and dependability of the dog were established, the officer who handled the dog was trained, and the evidence was relevant").

In *Florida v. Harris*, 568 U.S. 237 (2013), the U.S. Supreme Court opined on the reliability of scent detection dogs. In that case, the defendant moved to suppress the evidence found in his truck on the ground that the drug detection dog's alert had not given the arresting

officer probable cause for a search. *Id.* at 240. The trial court concluded that the officer had probable cause to search the defendant's truck and so denied the motion to suppress. *Id.* at 242. The Florida Supreme Court reversed, holding that the officer lacked probable cause to search the defendant's vehicle under the Fourth Amendment. *Id.* at 242-43. To assess the reliability of a drug-detection dog, the Court created a strict evidentiary checklist, "whose every item the State must tick off." *Id.* at 244. On appeal, the U.S. Supreme Court, in a unanimous opinion authored by Justice Kagan, disagreed and held that a trial court's finding of a drug-detection dog's reliability "cannot depend on the State's satisfaction of multiple, independent evidentiary requirements." *Id.* at 245. The Supreme Court stated that:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume, subject to any conflicting evidence offered, that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Id.* at 246. The Supreme Court sided with the view taken by Justice Canady in his dissent wherein he opined that such "elaborate and inflexible evidentiary requirements . . . [were] inconsistent with the proper understanding of probable cause as a 'practical, non-technical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Harris v. Florida*, 71 So. 3d 756, 775 (Fla. 2011) (Canady, J., dissenting) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370, (2003)); *see also Jones v. Commonwealth*, S.E.2d 727, 733 (Va. 2009) ("The narcotics detection dog's reliability can be established from its training and experience, as well as a proven track record of previous alerts to the existence of illegal narcotics. Specific certifications and the results of field testing are not required to establish a sufficient foundation [for the dog's reliability].")

The above-cited cases did not hold that the scientific basis for dog tracking evidence must be explained before it can be admitted. *See Harris*, 568 U.S. at 246; *Gear,* 257 So. 3d at 1245-46. Rather, they held that dog detection evidence must be shown to be reliable from experience. *See Harris*, 568 U.S. at 246; *Gear,* 257 So. 3d at 1245-46. The showing of reliability is met by testimony from the handler establishing that: they were qualified to work with the dog and to interpret its responses; the dog

had proved successful and reliable; the dog was a sufficiently trained and proven tracker; the track at issue was within the scope of the dog's training and proficiency; and there is additional indicia of reliability or corroboration. *See Gear,* 257 So. 3d at 1245-46. However, the corroborative evidence need not be evidence which, standing alone, links the defendant to the crime. *See Green,* 641 So. 2d at 394. Corroborative evidence need only support the accuracy of the dog evidence and the conclusions implied by it. *See id.*

We find that the trial court properly admitted the cadaver dog evidence. Florida case law involving dog scent evidence accords with the proposition that courts need not consider the science underlying testimony relating to cadaver dog evidence. *See Gear,* 257 So. 3d at 1245-46. "[I]t is common knowledge that some dogs, when properly trained and handled, can discriminate between human odors." *See People v. Brooks,* 950 P.2d 649, 652-53 (Colo. App. 1997) (quoting *State v. Roscoe,* 700 P.2d 1312, 1319-20 (Ariz. 1984)). The evidence of the reliability of a dog's alert is "readily understood by a jury." *Id.* at 653. Or as Bob Dylan once said, "you don't need a weatherman to know which way the wind blows." BOB DYLAN, *Subterranean Homesick Blues,* on BRINGING IT ALL BACK HOME (Columbia Records 1965); *McGraw v. State,* 245 So. 3d 760, 770 (Fla. 4th DCA 2018) (Gross, J., dissenting), *vacated,* 2019 WL 6333909 (Fla. Nov. 27, 2019).

Florida cases involving dog scent evidence typically hold that trial courts only need to determine whether a proper foundation pertaining to a dog's reliability was laid to admit the evidence. *See Gear,* 257 So. 3d at 1246. As such, the foundational requirements for admitting other forms of dog tracking evidence must similarly be applied to evidence involving cadaver dogs. *See Lane,* 862 N.W.2d at 457 (stating that the use of cadaver dogs is "not significantly different from other forms of dog tracking evidence"). "Tracking dogs and cadaver dogs both use a precise sense of smell to identify scents that are outside the range of human ability to detect." *Id.* There is no discernible difference in abstract terms of reliability between a handler taking a cadaver dog to a house and having it alert to the odor of decomposition in a particular area, and a handler taking a dog to an area and following a scent trail. Accordingly, we affirm on this issue.

Torrez also argues that the cadaver dog expert testimony was inadmissible due to its lack of scientific reliability. "A trial judge has the discretion to determine if a witness's qualifications render him or her an expert, and this determination will not be overturned absent clear error." *See Simmons v. State,* 934 So. 2d 1100, 1117 (Fla. 2006). "A trial court's ruling on the admissibility of evidence is subject to an abuse of discretion

standard of review, but the court's discretion is limited by the rules of evidence and the applicable case law." *Horwitz v. State*, 189 So. 3d 800, 802 (Fla. 4th DCA 2015). To be admissible, expert testimony must "assist the trier of fact in understanding the evidence or in determining a fact in issue." § 90.702, Fla. Stat. (2017); *accord Salomon v. State*, 267 So. 3d 25, 31 (Fla. 4th DCA 2019). Expert testimony must concern a subject which is "beyond the common understanding of the average person" to be helpful to the trier of fact. *See State v. Nieto*, 761 So. 2d 467, 468 (Fla. 3d DCA 2000) (quoting *La Villarena, Inc. v. Acosta*, 597 So. 2d 336, 339 (Fla. 3d DCA 1992)). "[E]xpert testimony should be excluded where the facts testified to are of such a nature as not to require any special knowledge or experience in order for the jury to form conclusions from the facts." *See Johnson v. State*, 393 So. 2d 1069, 1072 (Fla. 1980).

Challenges to an expert's measurements, methods and determinations do not render inadmissible an expert opinion based on them but goes to the weight of the evidence, raising factual questions to be determined by the jury. *See Murray v. State*, 838 So. 2d 1073, 1079–80 (Fla. 2002) ("[T]hese differing expert opinions pose no bar to the admissibility of the tests or results; the respective credibility of the experts, and the weight ultimately ascribed to their testimony, shall be determined by the jury."). Provided that certain foundational requirements are met, Florida courts have allowed the admission of expert testimony regarding dog tracking and narcotics detection dog evidence. *See Gear*, 257 So. 3d at 1245-46; *Blackmon v. State*, 570 So. 2d 1074, 1076 (Fla. 1st DCA 1990) (upholding the use of a narcotics dog during a traffic stop to establish probable cause).

The Michigan Court of Appeals came to a similar conclusion in *Lane*, 862 N.W.2d at 455-58. In *Lane*, a case which involved a cadaver dog, the Court of Appeals rejected defendant's argument that cadaver dog evidence could not be admitted because chemical evidence could not corroborate whether there was human decomposition at the locations identified by the dog. *Id.* at 457. In analyzing this argument under Michigan's rule of evidence regarding the admission of expert opinion testimony on areas of specialized knowledge (MRE 702), the Court of Appeals held that a lack of scientific verification of the presence of a specific scent was not reason to exclude cadaver dog evidence in every case. *Id.* at 457-48. Instead, the Michigan Court of Appeals found that the evidence could be admitted after a sufficient foundation was established that: "(1) the handler was qualified to use the dog, (2) the dog was trained and accurate in identifying human remains, (3) circumstantial evidence corroborates the dog's identification, and (4) the evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it." *Id.* at 457.

In the context of cadaver dog evidence, we hold, as did *Lane*, that expert testimony relating to a dog's reaction to the odor of human decomposition is admissible after a proper foundation for reliability is laid to show that: (1) the handler was qualified to work with the dog and to interpret its responses; (2) the dog was sufficiently trained and accurate in the detection of human decomposition odor; (3) circumstantial evidence corroborates the dog's scent identification; and (4) the evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it. *See Lane*, 862 N.W.2d at 457. We conclude that these foundational requirements for the admission of cadaver dog evidence were met in this case.

First, the record contains evidence that Officer Strickland was qualified to work with Jewel and to interpret her responses. Officer Strickland described his experience working with the dog. He had engaged in extensive training with Jewel, was certified with her, and regularly conducted training with her. *See Harris*, 568 U.S. at 246.

Second, Jewel was sufficiently trained and accurate. Jewel's training records reflect that the dog participated in several recertifications showing excellent proficiency ratings exceeding ninety-one percent and only had one instance of a false positive with no similar incidents since remediation. *See id.*

Third, the record includes evidence corroborating Jewel's scent identification. The search of Vilet's residence with Jewel was initially conducted several days after Vilet was last seen. Prior to the search, bloodstain evidence from the residence indicated that a violent crime had been committed there. Jewel alerted to an area just outside the front door of the home. Because Vilet was not located at the residence, and with evidence suggesting that Torrez's car was at the home on the date of Vilet's disappearance, it was reasonable to suspect that Torrez's car may have been used in connection with her disappearance. Months later, Jewel alerted to decomposition odor in various places in Torrez's car, particularly the trunk. Further, another degree of corroboration was provided when a second cadaver dog, Piper, and handler for a different police agency demonstrated an odor alert to the same vehicle, and in the same places of the car. Courts in other states have observed that the use of trained dogs as a follow-up investigative technique to partially corroborate information received is "a useful, entirely reasonable and permissible procedure." *People v. Moore*, 689 N.E.2d 1181, 1185 (Ill. App. Ct. 1998) (citation omitted).

16

Last, Dr. Furton testified that, depending on the concentration of the odor, an odor can be detected after a lengthy passage of time, especially in enclosed areas. There was nothing to suggest that the detected odors were stale or that the evidence was contaminated. *See, e.g., People v. Montano*, N.E.3d 114, 130-31 (Ill. App. Ct. 2017) (upholding defendant's conviction for first-degree murder where cadaver dogs alerted to the odor of human remains, in a location where the victim's body had allegedly been buried, seventeen years after the victim's disappearance and presumed death).

The trial court heard evidence as to the qualifications and training of the cadaver dog handler, the training of the dog itself, and the circumstances surrounding the search, the dog's scent identification and other corroborating facts. This evidence established a proper foundation for the admission of the expert cadaver dog evidence. Therefore, we hold that the trial court did not err in admitting the expert testimony.

### B. Admissibility under § 90.403

Notwithstanding all of the above, the defense also objected to the admission of the evidence under section 90.403, Florida Statutes (2017), which states: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." The trial court, having considered the testimony as it relates to the facts of this case, found that the evidence was relevant and that its probative value was not outweighed by the prejudice. *See* § 90.403, Fla. Stat. We find no error in the admission of the cadaver dog evidence under section 90.403. First, admission of this evidence was not unduly prejudicial to Torrez in light of the other evidence presented by the State. A trial court's decision to admit or exclude testimony will not be reversed absent an abuse of discretion. *See Eliakim v. State*, 884 So. 2d 57, 60 (Fla. 4th DCA 2004). Second, defense counsel was able to cross-examine the relevant witnesses and elicit testimony about false positives and alert errors to impugn the dog's reliability. Introducing the potential for a false alert in this case may have lessened the weight of the evidence but did not undermine the foundation. Potential concerns about the fallibility of dog scent evidence, or the fear a jury may have been greatly influenced by hearing such evidence, did not substantially outweigh the probative value of the testimony, especially in light of the cautionary instructions provided by the court at defense counsel's request. Further, such contentions go to factual issues involving the weight of the evidence rather than its admissibility and as such are for the fact-finder to resolve. *See Murray*, 838 So. 2d at 1079–80.

C. Conclusion

For cadaver dog evidence to be admissible, each dog's ability and reliability should be shown on a case-by-case basis. Courts should not merely assume that any well-trained dog can detect specific odors, but instead should understand that a dog's abilities, whether innate or acquired, is a fact which may be proven by evidence like any other fact.

## III.    Competency

 "The issue of '[w]hether the circuit court fundamentally erred in failing to hold a competency hearing presents a pure question of law subject to *de novo* review.'" *Baker v. State*, 221 So. 3d 637, 639 (Fla. 4th DCA 2017) (quoting *A.L.Y. v. State*, 212 So. 3d 399, 402 (Fla. 4th DCA 2017)).

Pursuant to Florida Rule of Criminal Procedure 3.210(b):

> If, at any material stage of a criminal proceeding, the court of its own motion, or on motion of counsel for the defendant or for the state, has reasonable ground to believe that the defendant is not mentally competent to proceed, the court shall immediately enter its order setting a time for a hearing to determine the defendant's mental condition[.]

Fla. R. Crim. P. 3.210(b).

In *Machin v. State*, 267 So. 3d 1098, 1101 (Fla. 4th DCA 2019), this Court outlined the remedy for a trial court's failure to conduct a hearing or enter an order on competency:

> [W]here the circuit court finds reasonable grounds to question a defendant's competency and does not subsequently hold a hearing or make a written finding of competency, we will temporarily remand the case to the circuit court . . . [to] hold a hearing and issue an order determining whether a nunc pro tunc competency evaluation is possible.

*Machin*, 267 So. 3d at 1101 (internal citation omitted). However, Torrez is not automatically entitled to a new sentencing hearing. As we have previously instructed:

> [I]f the [trial] court can make a *nunc pro tunc* finding as to appellant's competency based upon the existence of evaluations performed contemporaneous with trial and

18

without relying solely on a cold record, and can do so in a manner which abides by due process guarantees, then it should do so and enter a corresponding written order. However, if the court finds, for any reason, that an evaluation of appellant's competency at the time of trial cannot proceed in a way that ensures appellant's due process rights, then the [trial] court should adjudicate [his] current competency and, if [he] is competent, conduct a new trial on all counts.

*Baker*, 221 So. 3d at 641-42 (citations omitted).

In this case, defense counsel represented at the sentencing hearing that an evaluation had been conducted before trial, and Torrez was found to be competent to stand trial.[1] Though no competency evaluation report is included in the record on appeal, the record does contain confirmation that another competency evaluation was performed prior to sentencing and that Torrez was deemed competent to be sentenced.

Therefore, we remand the case for the trial court to decide whether it can determine Torrez's competency at sentencing *nunc pro tunc* in accordance with our prior decisions and, if so, enter an appropriate written order.

*Affirmed, but remanded with instructions.*

GROSS and DAMOORGIAN, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

---

[1] Although Torrez claims that his competency to stand trial is at issue, this claim is not addressed as we find that it has no merit.